# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 28, 2019          Decided June 12, 2020

No. 18-1201

CIRCUS CIRCUS CASINOS, INC., D/B/A CIRCUS CIRCUS LAS
VEGAS,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 18-1211

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Paul T. Trimmer* argued the cause for petitioner. With him
on the briefs was *Daniel I. Aquino.*

*Kellie Isbell*, Senior Attorney, National Labor Relations
Board, argued the cause for respondent. With her on the brief
were *Peter B. Robb*, General Counsel, *David S. Habenstreit*,
Assistant General Counsel, and *Julie Brock Broido*,
Supervisory Attorney.

Before: SRINIVASAN, *Chief Judge,* RAO, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

Opinion concurring in part and dissenting in part filed by *Chief Judge* SRINIVASAN.

RAO, *Circuit Judge*: This case arises out of an employment dispute between Circus Circus Casinos, Inc. ("Circus") and temporary employee Michael Schramm. The National Labor Relations Board ("NLRB") determined that Circus committed three unfair labor practices: threatening Schramm for exercising statutory rights under the National Labor Relations Act ("NLRA"), interfering with his right to union representation during an investigatory meeting, and suspending and terminating him because of protected union activity. Circus petitions for review, arguing the Board's decision misapplied governing law and lacked substantial evidence. For the reasons that follow, we grant Circus's petition for review in full and deny the Board's cross-application for enforcement.

I.

Circus Circus is a hotel and casino in Las Vegas, Nevada. In September 2013, the company hired journeyman carpenter Michael Schramm into its engineering department on a temporary basis to upgrade doorjamb security in the hotel's guest rooms. As a carpenter, Schramm was represented by the United Brotherhood of Carpenters and Joiners of America, Southwest Regional Council of Carpenters Local #1780 ("the Union").

In November or early December 2013, Schramm and about twelve other employees attended one of the engineering department's mandatory weekly safety meetings along with

department head Rafe Cordell and several other managers. During the meeting, an engineer named Fred Tenney brought up the concern that secondhand exposure to marijuana smoke in guest rooms could cause employees to test positive for illegal drugs. Schramm echoed this concern, and a discussion ensued between Cordell, Schramm, and Tenney. According to Schramm and Tenney, they repeatedly pressed Cordell for additional commitments by the company and refused to accept his assurances that employees' exposure was insufficient to produce a positive test result. On their account, Cordell eventually became angry, turned red, and told Schramm "you know what, maybe we just won't need you anymore" before abruptly leaving the meeting. Testimony from Cordell and other managers and employees also in attendance reported the weekly safety meeting proceeded just like any other and concluded without incident. Although some remember a discussion about marijuana policy, none remember Cordell making a threatening statement.

Several weeks later, Circus initiated an investigation into whether Schramm violated company policy with respect to a medical exam mandated by the Occupational Safety and Health Administration ("OSHA"). Pursuant to OSHA regulations, Circus provides custom-fit respirators to employees likely to encounter airborne hazards during their work, including virtually all members of the engineering department. *See* 29 C.F.R. § 1910.134(a)–(d). Because respirators can aggravate certain underlying health conditions, OSHA requires employers to contract with a medical service provider to review an employee's medical history and perform a medical examination prior to the custom-fitting process. *See id.* § 1910.134(e)–(f). To assure compliance with OSHA regulations, Circus maintains written policies that make submitting to the testing process a mandatory condition of employment. The company's General Rules of Conduct

specify that "serious violations," including "insubordination" and "[f]ailure or refusal to submit to a physical examination … ordered by Circus," "will result in disciplinary action up to and including immediate termination."

Schramm arrived at an onsite clinic for his scheduled testing appointment on December 10. He refused, however, to complete preliminary paperwork without first speaking with the contract doctor. Although clinic technicians explained he could not see the doctor without first completing a preliminary intake process, Schramm left the appointment and returned to work. Clinic staff relayed the incident to Cordell, who quickly suspended Schramm pending investigation into his refusal to take the medical exam. Over the next three days, Circus personnel interviewed Cordell and several other managers about the incident and scheduled Schramm for an investigatory interview. When a Circus human resources representative contacted Schramm to set up the interview, she provided a phone number for the Union in the event Schramm desired to have a Union representative present at the meeting. The record indicates Schramm attempted to contact the Union twice by phone, but to no avail.

Schramm returned to the Circus facility on December 13 for the interview. Cordell and two human resources representatives attended on behalf of Circus. According to Schramm, he looked around the hallway for a Union representative before entering the meeting and began by stating: "I called the Union three times [and] nobody showed up, I'm here without representation." Circus's witnesses deny Schramm made this statement at the beginning of the meeting but acknowledge continuing the interview without offering Schramm union representation.

In late December, Cordell and human resources met once again with Schramm to terminate his employment; this time he was accompanied by a Union steward. Circus represented during the administrative proceedings that it fired Schramm for violating the company's rules against insubordination and refusing to submit to mandatory testing.

Schramm subsequently filed unfair labor practice charges on his own behalf with the NLRB. After overriding the regional director's decision not to pursue the charges, the Board's general counsel issued a complaint alleging Circus violated three standards established under Section 8(a)(1) of the Act. *See* 29 U.S.C. § 158(a)(1). The complaint first alleged Cordell's comment to Schramm during the weekly safety meeting interfered with NLRA rights by discouraging employees from voicing shared concerns about the terms and conditions of employment. Second, the complaint alleged Schramm's statement at the beginning of the investigatory meeting was a request for union representation under *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), and that Circus violated the Act by ignoring the request. Finally, the complaint alleged that under the test for mixed-motive termination in *Wright Line*, 251 NLRB 1083 (1980), Circus unlawfully suspended and terminated Schramm because of activity protected under the Act and not because of his alleged workplace misconduct. After a hearing, an administrative law judge ("ALJ") issued a recommended decision finding that Circus committed the unfair labor practices brought by the general counsel.[1]

---

[1] Circus does not contest the finding that Schramm engaged in protected activity under Section 7 of the Act by seconding Tenney's marijuana smoke concern during the safety meeting. *See* 29 U.S.C. § 157. The Board must identify protected activity to invoke NLRA jurisdiction in the first instance. In the absence of an objection by

6

The Board, sitting as a delegated three-member panel, *see* 29 U.S.C. § 153(b), adopted the ALJ's decision in all material respects and rejected a request by Circus to reopen the record for additional evidence tending to impeach Tenney, Schramm's key corroborating witness. *See Circus Circus Casinos, Inc.*, 366 NLRB No. 110 (June 15, 2018). The Board noted Chairman Ring dissented as to the *Weingarten* violation on the ground that the majority was wrong to find a request for representation "subsumed" in Schramm's statement, which described prior requests to the Union rather than a request to the company. *Id.* at *1 n.2. To remedy these unfair labor practices, the Board ordered Circus to reinstate Schramm with backpay, cease and desist from similar violations, and post a workplace notice describing the agency's findings. *Id.* at *2.

Circus petitioned for review of the Board's unfair labor practice findings and refusal to reopen the record, arguing the order is inconsistent with the NLRA and the Administrative Procedure Act ("APA"). The Board cross-petitioned for enforcement of the order.

II.

Judicial review of the Board's decisions and orders must evaluate both the Board's statements of law and application of law to the facts. Congress combined within the NLRB the authority to make rules, enforce rules, and adjudicate whether rules were violated in individual cases. *See* 29 U.S.C. § 160(a)–(c). The Supreme Court upheld the constitutionality of the NLRB against due process challenges notwithstanding this combination of functions in part because appellate review would afford "adequate opportunity to secure judicial

---

Circus, however, we will not consider this jurisdictional issue and express no opinion on the Board's finding.

protection against arbitrary action." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 47 (1937). Orders of the Board cannot be enforced without Article III approval, *see* 29 U.S.C. § 160(e)–(f), and reviewing courts "are not to abdicate the conventional judicial function" because "Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490 (1951). Judicial review ensures that the Board stays within statutory and constitutional limits.

The Board rarely promulgates regulations through notice and comment but instead sets standards through adjudication. The Board, "uniquely among major federal administrative agencies, has chosen to promulgate virtually all the legal rules in its field through adjudication rather than rulemaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294–95 (1974)). Thus, an order of the Board might simply apply an existing standard, or alternatively, it might set forth a new standard while deciding a particular case. Nonetheless, as with other administrative agencies, the Board is subject to the APA's requirement of "reasoned decisionmaking." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). Legal standards promulgated by the Board under the NLRA must be "rational and consistent with the Act," *id.* at 364 (citation omitted), and applications of those standards in individual cases must be "reasonable and reasonably explained," *Carlson v. PRC*, 938 F.3d 337, 343–44 (D.C. Cir. 2019) (citation omitted).

Because Board adjudications may establish new rules or apply existing rules, "[o]ur standards for arbitrary and capricious review distinguish between an agency's burden of explanation when announcing new rules and when applying existing rules in individual cases." *Baltimore Gas & Elec. Co.*

*v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020). New rules set through adjudication must meet the same standard of reasonableness as notice and comment rulemaking. *See Allentown Mack*, 522 U.S. at 374 (citing *State Farm*, 463 U.S. at 52). When the Board seeks to change applicable standards through an adjudication, the Board must "display awareness that it *is* changing position," demonstrate the rule is "permissible under the statute," and show "there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). By contrast, Board orders applying existing policy must be consistent with precedent and cannot be enforced when the agency "erred in applying established law to the facts of the case." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (citation omitted); *see also Rapoport v. SEC*, 682 F.3d 98, 104 (D.C. Cir. 2012) ("[A]gencies must apply their rules consistently. They may not depart from their precedent without explaining why. If they do, we have no choice but to remand for a reasoned explanation." (citation and internal quotation marks omitted)).

Orders of the Board are arbitrary and capricious when they "simply disregard rules that are still on the books." *Fox Television*, 556 U.S. at 515. Rule of law principles require that parties have fair notice and an opportunity to conform their behavior to legal rules.[2] As the Supreme Court has explained, "the Board must be required to apply in fact the clearly

---

[2] Administrative law's reasonable explanation requirement balances the need for definite standards with respect for agency discretion. Insisting on definite standards recognizes "the basic human claim that the law should provide like treatment under like circumstances," and "a clear statement of the standards the agency is applying is necessary if administrative adjudication is to be consistent with the democratic process." Henry J. Friendly, *The Federal Administrative Agencies: The Need for Better Definition of Standards*, 75 HARV. L. REV. 863, 878, 880 (1962).

understood legal standards that it enunciates in principle," and "courts are entitled to take those standards to mean what they say." *Allentown Mack*, 522 U.S. at 376–77. Reviewing courts cannot simply take the Board's orders in isolation. Instead, we must identify the standard at issue, examine its application in prior adjudications, and then determine whether the instant case is a faithful application of existing law or instead a *sub silentio* revision. *See, e.g.*, *ABM Onsite Servs.-West, Inc. v. NLRB*, 849 F.3d 1137, 1146 (D.C. Cir. 2017) ("[W]hen the Board fails to explain—or even acknowledge—its deviation from established precedent, its decision will be vacated as arbitrary and capricious." (citation and internal quotation marks omitted)).

Two provisions of the NLRA govern this case. Section 8(a)(1) makes it unlawful for employers to "interfere with, restrain, or coerce employees" in the exercise of protected rights. 29 U.S.C. § 158(a)(1). Section 7 protects the right of employees to organize, bargain collectively, and "refrain from" or "engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id.* § 157. In this case, the Board purported to apply three well established standards to determine Circus committed unfair labor practices by unlawfully threatening, investigating, suspending, and terminating Schramm. Circus contests both the factfinding and legal analysis supporting the Board's findings. We take each alleged violation in turn.

## A.

We begin with the Board's conclusion that Circus violated the *Weingarten* rule by denying Schramm's request for union representation at the investigatory meeting. In *NLRB v. J. Weingarten, Inc.*, the Supreme Court approved the Board's construction of Section 7 of the Act as guaranteeing an

employee the right "to refuse to submit without union representation to an interview which he reasonably fears may result in his discipline." 420 U.S. at 256. The *Weingarten* right "arises only in situations where the employee requests representation," *id.* at 257, and leaves employers free to investigate and discipline pursuant to "legitimate employer prerogatives" short of compelling unrepresented attendance, *id.* at 258. To prove a *Weingarten* allegation, the general counsel must show (1) the employee made a valid request for a union representative to be present during an investigatory interview; (2) the employee reasonably believed the interview might result in disciplinary action; and (3) the employer compelled the employee to attend the interview without union representation. 420 U.S. at 256–58 (citing *Mobil Oil Corp.*, 196 NLRB 1052, 1052 (1972), and *Quality Mfg. Co.*, 195 NLRB 197, 198–99 (1972)); *see also Costco Wholesale Corp.*, 366 NLRB No. 9, at *1 (Feb. 2, 2018).

The Board maintains Schramm triggered *Weingarten* by stating at the beginning of the meeting: "I called the Union three times [and] nobody showed up, I'm here without representation." As the Board explained, "[s]ubsumed in the statement is a reasonably understood request to have someone present at the meeting." *Circus Circus*, 366 NLRB No. 110, at *1. Further, the Board concluded Circus unlawfully compelled Schramm when the company failed to offer him the choice between continuing unassisted or foregoing the interview altogether. *Id.* at *2 n.10; *see also Bellagio, LLC v. NLRB*, 854 F.3d 703, 708 (D.C. Cir. 2017) ("[O]nce an employee validly requests a union representative, an employer has three paths open to it: it may grant the request, end the interview, or offer the employee the choice between having an interview without a representative or having no interview at all."). Noting his dissent, Chairman Ring would have concluded Schramm's statement fell short of a valid request for representation under

any formulation previously recognized by the Board. *Circus Circus*, 366 NLRB No. 110, at \*1 n.2. Circus argues the Board's conclusion that Schramm made a valid request is a serious departure from the *Weingarten* rule. We agree, and conclude the Board acted in an arbitrary and capricious manner by significantly altering the test for valid *Weingarten* requests to cover the facts of this case.

The *Weingarten* allegation should have been dismissed because Schramm did not make an affirmative request for union representation. To invoke the *Weingarten* right, an employee's utterance must be "reasonably calculated" to put the employer "on notice of the employee's desire for union representation." *Houston Coca Cola Bottling Co.*, 265 NLRB 1488, 1497 (1982); *Consol. Edison Co. of N.Y.*, 323 NLRB 910, 916 (1997). Under the reasonably calculated notice standard, the Board has long required an employee to affirmatively request representation in order to invoke the protections of the Act. Valid requests may take the form of straightforward demands, *see, e.g.*, *Consol. Edison*, 323 NLRB at 914 ("I need a Union Steward."); questions about the need for assistance, *see, e.g.*, *NLRB v. N.J. Bell Tel. Co.*, 936 F.2d 144, 145 (3d Cir. 1991) ("[S]hould [I] have a union representative present[?]"); or requests for delay or an alternative representative, *see, e.g.*, *Montgomery Ward & Co.*, 273 NLRB 1226, 1227 (1984). In this case, Schramm merely recited facts about his past communication with the Union and the circumstances of his attendance at the meeting: "I called the Union three times [and] nobody showed up, I'm here without representation." Any affirmative request by Schramm was made to the Union rather than to a Circus representative—there was no valid request here to trigger *Weingarten*'s requirements.

None of the Board's prior decisions construe *Weingarten*'s reasonably calculated notice standard broadly enough to cover

mere statements of fact, and we were unable to find a precedent accepting similar remarks as an affirmative request. Nor was our dissenting colleague. *See* Dissenting Op. 2. Instead, affirmative requests have always taken the form of demands for representation, questions, or related requests. *See, e.g.*, *Gen. Die Casters, Inc.*, 358 NLRB 742, 742 (2012) (finding request where employee asked twice if he should "get somebody in here"); *Bodolay Packaging Mach., Inc.*, 263 NLRB 320, 325 (1982) (finding request where employee asked if he "needed a witness"). In the absence of an affirmative request, the Board must dismiss *Weingarten* charges because there is no protected concerted activity by the employee and the NLRA does not apply. *See, e.g.*, *Costco Wholesale*, 366 NLRB No. 9, at *1 (dismissing unfair labor practice charge for lack of employee request); *USPS*, 360 NLRB 659, 660 (2014) (same); *Kohl's Food Co.*, 249 NLRB 75, 78 (1980) (same).

The text and structure of the NLRA demonstrate why an affirmative request is an indispensable element of a *Weingarten* violation. As the Supreme Court explained in *Weingarten*, the affirmative request requirement "inheres in [Section] 7's guarantee of the right of employees to act in concert for mutual aid and protection." 420 U.S. at 256. Employee requests for union representation trigger an employer's duty to respond under Section 8(a)(1) when they amount to protected "other concerted activities" under Section 7. The phrase "other concerted activities" must be read in context and is preceded by a series of affirmative rights: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Under the *ejusdem generis* canon, an enumerated list of specific, affirmative actions preceding the general term "other concerted activities"

creates an inference that the catch-all phrase is similarly limited to affirmative acts. *See Wash. Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001))). As there was no affirmative request on these facts, Circus was not required to offer Schramm representation or to take any other action under the *Weingarten* rule.

By deviating from established practice in this case, the Board expanded the reach of *Weingarten* without accounting for employee choice, a central policy of the NLRA. *Cf. Colo. Fire Sprinkler, Inc. v. NLRB*, 891 F.3d 1031, 1040–41 (D.C. Cir. 2018) (emphasizing the importance of employee choice in the selection of a union representative under Section 9(a)). *Weingarten*'s emphasis on affirmative employee requests serves not only to notify the employer that the employee is invoking statutory rights, but also to protect the employee's choice *not* to invoke the right when he believes doing so would be against his interests. Union representatives serve the union's interest rather than those of any single member, and representatives may be called upon to testify on behalf of the employer as well as the employee. *See Appalachian Power Co.*, 253 NLRB 931, 933 (1980) (emphasizing an employee's "choice of deciding whether the presence of the representative was more or less advantageous to his interests" is "one of the fundamental purposes of the rule as articulated in *Weingarten*"); *USPS*, 241 NLRB 141, 152–53 (1979) (contrasting role of union representative to that of a criminal attorney). Thus, one consequence of the Board's finding that

Schramm's request was "subsumed" in a simple statement of fact would be to limit employee choice.[3]

If "requests" were interpreted as broadly as the Board elected to do here, the *Weingarten* right would transform from one that must be invoked by an employee to one that cautious employers must assume automatically applies to all covered investigatory meetings. Yet nothing in *Weingarten* or the Board's subsequent application of the rule obligates employers prophylactically to inform employees of their right to representation. *See El Paso Healthcare Sys.*, 358 NLRB 460, 467 (2012) ("The employee's right to the assistance of a union representative arises only upon the request of the employee; the employer has no duty to inform the employee of the right."); *USPS*, 241 NLRB at 152 ("[T]he *Weingarten* class of cases implicitly hold that the employer is under no obligation affirmatively to advise the employee of his *Weingarten* rights.").

Consistent with the Board's precedents, we hold *Weingarten* requires an employee to affirmatively request union representation in a manner reasonably calculated to put

---

[3] Our dissenting colleague believes the Board's decision here would not disturb *Weingarten*'s treatment of employee choice. *See* Dissenting Op. 3. It is true that after a valid request, the employer may offer the employee a choice between formally waiving representation or forgoing the interview. *See Weingarten*, 420 U.S. at 258–59; *Bellagio*, 854 F.3d at 708. Yet a rule that requires such a choice after any type of open-ended statement would in practice change the *Weingarten* right from one invoked by the employee to a choice framed by the employer and requiring an affirmative waiver by employees. Such a standard is wholly different from the *Weingarten* framework and would impose a distinct set of burdens on employees and employers not contemplated by longstanding precedent.

the employer on notice. *See USPS*, 360 NLRB at 660 ("Even assuming [an employee] had an objectively reasonable basis to fear discipline, the right to *Weingarten* representation is triggered when the employee requests it." (citing 420 U.S. at 257)); *Consol. Edison*, 323 NLRB at 916 (requests "need only be sufficient to put the employer on notice"); *Houston Coca Cola Bottling*, 265 NLRB at 1497 (language must be "reasonably calculated to apprise the [e]mployer"). Under the reasonably calculated notice standard, valid requests may take the form of demands, questions, or related requests for delay or for a specific representative. On this record, Schramm's statement of fact standing alone was insufficient to trigger the protections of the Act. Because the Board erred by concluding otherwise, we set aside this unfair labor practice finding and vacate the corresponding part of the Board's order. *See Midwest Div.-MMC, LLC v. NLRB*, 867 F.3d 1288, 1297 (D.C. Cir. 2017) (granting review for misapplication of *Weingarten*); *Bellagio*, 854 F.3d at 709 (same).[4]

## B.

Next, we review the Board's conclusion under *Wright Line* that Circus violated Section 8(a)(1) of the Act by suspending

---

[4] Even if Schramm's statement could be construed as an affirmative request, the general counsel must also show Circus compelled his attendance at the interview. "[T]he mere fact that an employee's request for union representation is not met does not, without more, mean that the employer has committed an unfair labor practice." *Bellagio*, 854 F.3d at 708–09. The *Weingarten* right gives an employee the choice to "forgo his guaranteed right and … participate in an interview unaccompanied by his union representative." 420 U.S. at 256–57. Because Circus rested its petition for review on other grounds, however, we express no opinion on whether the record suggests that Schramm elected not to participate in the interview but was compelled to do so by his employer.

and terminating Schramm because of protected activity. Employers violate Section 8(a)(1) when they terminate or otherwise discipline an employee because of conduct protected by the Act. *See Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015).[5] At the same time, "employers retain the right to discharge workers for any number of other reasons unrelated to the employee's union activities." *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 394 (1983); *see also Jones & Laughlin*, 301 U.S. at 45–46 ("The [A]ct does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. … [T]he Board is not entitled to make its authority a pretext for interference with the right of discharge."). When an employer asserts a legitimate basis for its disciplinary decision, the line between employer prerogative and unlawful infringement of employees' rights is a question of motive.

In *Wright Line*, the Board adopted the Supreme Court's burden-shifting framework from *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 286–87 (1977), to accommodate "the legitimate competing interests inherent in dual motivation cases." 251 NLRB at 1088. Under the *Wright Line* standard, the general counsel must first establish a *prima facie* case that animus against protected activity was "a motivating factor" in the employer's decision. *Inova*, 795 F.3d at 80; *Wright Line*, 251 NLRB at 1090. Second, the burden of persuasion shifts to the employer to show it "would have taken" the same action even in the absence of protected conduct. *Inova*, 795 F.3d at 80 (citation omitted); *Wright Line*, 251 NLRB at 1091; *see also Transp. Mgmt.*, 462

---

[5] Employer discipline violates Section 8(a)(1) and (3) when the protected activity at issue is union participation. Section 8(a)(3) bars employers from discriminating in order "to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

U.S. at 403–04 (approving *Wright Line* as a valid interpretation of the Act).

Purporting to apply *Wright Line* to the facts of this case, the Board concluded Circus acted with animus against Schramm's exercise of NLRA rights and rejected the company's explanation that it would have fired Schramm regardless because he refused to comply with the medical examination requirement. The Board reasoned that if Circus's "true concern" was that Schramm undergo testing, "he would have been allowed to speak to the doctor prior to testing or, at a minimum, sent back for testing" before discipline. *See Circus Circus*, 366 NLRB No. 110, at *4. Circus disputes the Board's legal analysis under both prongs of *Wright Line*, arguing the Board accepted the general counsel's *prima facie* case despite an absence of evidence and, further, that the Board short changed the company's rebuttal case. Pointing to our decision in *Sutter East Bay Hospitals v. NLRB*, 687 F.3d 424 (D.C. Cir. 2012), Circus argues the Board failed to assess whether the company reasonably believed Schramm committed misconduct that the company consistently disciplines with similar severity. We assume without deciding that the general counsel satisfied his burden in the first prong and instead focus on *Wright Line*'s second prong. We agree with Circus that the Board misapplied *Wright Line* by failing to consider the company's rebuttal case in line with our decision in *Sutter East Bay*.

As we have explained, *Wright Line*'s second prong requires the Board to examine first, whether the employer "reasonably believed" the employee committed the acts supporting discipline, and second, whether the decision was consistent with the company's "policies and practice." *Sutter East Bay*, 687 F.3d at 435. In *Wright Line*, the Board analyzed whether the employer had "reason to believe" the terminated

employee violated company policy, and also whether the employee's asserted misconduct was "commonplace and generally resulted in no discipline whatsoever." 251 NLRB at 1091. The Board has repeatedly recognized that reasonable belief and consistency in enforcement are important aspects of the analysis. *See, e.g.*, *DTR Indus., Inc.*, 350 NLRB 1132, 1135–36 (2007) (dismissing unfair labor practice charge where employer reasonably believed employee produced defective products on purpose); *GHR Energy Corp.*, 294 NLRB 1011, 1014 (1989) (dismissing unfair labor practice charge where employer reasonably believed employees violated a policy the company strictly enforced). We have similarly examined these factors when assessing the Board's application of *Wright Line* on arbitrary and capricious review. *See, e.g.*, *Windsor Redding Care Ctr., LLC v. NLRB*, 944 F.3d 294, 300 (D.C. Cir. 2019) (refusing enforcement where Board ignored "zero-tolerance" policy for abuse toward elderly patients and disregarded evidence of strict enforcement in prior cases); *Hawaiian Dredging Constr. Co. v. NLRB*, 857 F.3d 877, 885 (D.C. Cir. 2017) (refusing enforcement where Board failed to recognize employer's good faith belief that misconduct occurred); *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1075 (D.C. Cir. 2016) (concluding employer acted inconsistently with policy and past practice when discharging employee).

Contrary to this longstanding precedent, the Board rejected Circus's rebuttal case without addressing evidence relevant to *Wright Line*'s second prong. First, the Board failed to assess whether Circus reasonably believed Schramm committed the misconduct in question. The company decided to suspend and discharge Schramm based on reports by medical personnel that Schramm failed to take a required medical exam. Circus's subsequent investigation did not reveal any contrary facts. Rather than assess whether it was reasonable for Circus to believe Schramm committed the

misconduct in question, the Board adopted factual findings about what happened at the clinic. What actually happened is immaterial, however, because Circus had no reason to doubt the reports of medical personnel and was therefore entitled to rely on them. *See Sutter East Bay*, 687 F.3d at 436 ("Whether the ALJ believes the reports are accurate or whether [the employee] actually engaged in the tirade is largely immaterial to whether [the employer] reasonably believed she did."). Further, the Board devoted significant attention to the finding that Schramm offered to retake the medical exam at the time of his suspension and again at the investigatory meeting with Cordell and human resources. Yet an employee's offer to correct misconduct does not disturb Circus's reasonable belief that a terminable offense had been committed.

Second, the Board failed to assess whether Circus's decision to terminate Schramm was consistent with company policy and practice. The company's written policies make "insubordination" and "refusal to submit to a physical examination" terminable offenses. Without addressing whether these rules covered Schramm's conduct, the ALJ instead analyzed OSHA regulations and Circus's testing policy to conclude Schramm had a right to discuss the content of the OSHA medical questionnaire with the doctor before submitting the form. We fail to see the relevance of this observation, however, given Schramm's testimony that he sought to obtain an exemption from wearing a respirator, not an exemption from the basic medical intake information clinic personnel requested (and Schramm refused to provide) before allowing him to speak with the doctor. Circus also presented testimony that no employee had ever refused to submit to an OSHA medical exam and identified three prior instances in which the company terminated employees for refusing to submit to a mandatory drug test. We need not decide whether this evidence would suffice to meet Circus's rebuttal burden under *Wright Line*'s

second prong. It is enough to conclude the Board failed to engage with this record evidence and thereby acted arbitrarily and without substantial evidence on the record as a whole. *See id.* at 437 ("The ALJ's conclusions leave that crucial second step of the *Wright Line* test unexamined and unanswered.").

Finally, we reject the alternative reasoning supplied by the Board that Circus "should have" been satisfied by Schramm's offers to retake the medical exam if his refusal was the company's "true concern." Circus is entitled to a policy of strict enforcement of its rules related to insubordination and compliance with testing policies. The Board cannot second guess an employer's legitimate and consistently enforced policies for safety and discipline in the workplace. To do so exceeds the Board's expertise and authority under the Act. *See Cellco P'ship v. NLRB*, 892 F.3d 1256, 1262 (D.C. Cir. 2018) ("It is clear that [the employer] has made a legitimate business judgment—a not unusual one—that an employee lying during an investigation is a serious threat to management of the enterprise. The Board has no warrant to challenge that decision."). "It is well recognized that an employer is free to lawfully run its business as it pleases. This means that an employer may discharge an employee for a good reason, a bad reason, or no reason, so long as it is not for an unlawful reason." *Epilepsy Found. of Ne. Ohio v. NLRB*, 268 F.3d 1095, 1105 (D.C. Cir. 2001) (citing *Transp. Mgmt.*, 462 U.S. at 394).

The Board suggests it was not required to analyze the employer's rebuttal under *Wright Line* and *Sutter East Bay* because its finding of "pretext" rendered reasonable belief and consistency in practice irrelevant. We reject this argument as a fundamental misstatement of *Wright Line*. Determining an employer's explanation to be pretext is a legal conclusion that follows from the *Wright Line* analysis, not an upfront finding that short circuits consideration of the whole record. The Board

adopted *Wright Line* to obviate distinctions between pretext and dual-motive cases by creating a uniform standard for "all cases alleging violation[s] of Section 8(a)(3) or violations of Section 8(a)(1) turning on employer motivation." 251 NLRB at 1089 & n.13; *see* NLRB GC Memorandum 80-58, 1980 WL 19306, at *1 (1980) ("The Wright Line test will be applied to both pretext and mixed motive cases."). This framework governs regardless of whether an employer's defense is meritorious or unmeritorious. Before determining the outcome of a case, the Board must examine whether the employer had a reasonable belief misconduct occurred and a prior consistent practice of enforcing rules against such misconduct. *See Frank Black Mech. Servs. Inc.*, 271 NLRB 1302, 1302 n.2 (1984) ("*Wright Line* analysis applies to all 8(a)(3) and (1) discharge cases regardless of the Board's ultimate conclusion as to motive." (citing *Transp. Mgmt.*, 462 U.S. at 393)). Nor will we simply accept the Board's application of *Wright Line* in this case as an authoritative interpretation. Courts do not defer to an agency's arbitrary and capricious interpretation of its own standard. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2418 (2019); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("An arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference.").

To defend its reasoning, the Board cites our decision in *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210 (D.C. Cir. 2016), for the proposition that compelling evidence of pretext precludes the need to consider Circus's reasonable belief. But we have never excused the Board from its duty to consider whether an employer's reasonable belief justifies a termination decision. In *Ozburn-Hessey*, our court considered whether the Board misapplied *Wright Line* by accepting pretext as a substitute for analyzing an employer's rebuttal case. We did not endorse this analytical approach, but instead concluded the Board had "rejected each of the reasons the [c]ompany

claimed to have relied on in taking those disciplinary actions" and, "after considering them in light of the record, concluded that they were 'mere pretext[s].'" 833 F.3d at 219. We explained that previous Board decisions also analyzed facts under both prongs of *Wright Line*, despite some dicta that might suggest an employer's rebuttal need not be considered on the whole record. *See id.* (quoting *Rood Trucking Co.*, 342 NLRB 895, 898 (2004)). The approach in *Ozburn-Hessey* reflects our court's commitment to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). That path is unavailable to us here, however, because the Board's reasoning "entirely fail[ed] to consider an important aspect of the problem." *Fred Meyer Stores*, 865 F.3d at 638 (quoting *State Farm*, 463 U.S. at 43).

As we held in *Sutter East Bay*, the Board must analyze an employer's reasonable belief that an employee engaged in misconduct and consider whether the disciplinary decision is consistent with the employer's policy and practice. Without this analysis we cannot ensure the Board correctly applied established law to the facts of the case, treated like cases alike, and, consistent with the Act, preserved both employee rights and employer prerogatives. Here, the Board misapplied *Wright Line* by failing to consider the employer's rebuttal case. This error is fatal to the Board's Section 8(a)(1) termination finding, and we therefore vacate that part of the Board's order. On remand the Board may reconsider whether the record supports an unlawful termination finding under the correct standard. *See Hawaiian Dredging*, 857 F.3d at 885 (refusing enforcement for failure to consider appropriate evidence under *Wright Line*'s second prong); *Sutter East Bay*, 687 F.3d at 436 (same).

C.

Finally, we turn to the Board's finding that Circus violated Section 8(a)(1) by unlawfully threatening Schramm. Employer statements "interfere with, restrain, or coerce" employees in violation of Section 8(a)(1) when they "reasonably tend[] to interfere" with the exercise of protected rights. *Adv. Life Sys., Inc. v. NLRB*, 898 F.3d 38, 44 (D.C. Cir. 2018). Proof of employer intent or coercive effect on employees is not required to establish a violation. *See Avecor, Inc. v. NLRB*, 931 F.2d 924, 931–32 (D.C. Cir. 1991); *Am. Freightways Co.*, 124 NLRB 146, 147 (1959). As with the other two unfair labor practice findings in this case, Circus contests the Board's factfinding and legal conclusion. Assuming without deciding that Cordell's statement could constitute an actionable threat if made as alleged, we focus on Circus's challenge to the Board's underlying factual finding that Cordell told Schramm "you know what, maybe we just won't need you anymore" during a weekly safety meeting. Although the Board enjoys wide deference with respect to factfinding, such deference is not unlimited. We conclude this unlawful threat finding presents the rare case in which an ALJ's witness credibility determinations must be set aside.

Whether Circus committed the relevant conduct is a question of fact reviewed for "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e)–(f); *see David Saxe Prods., LLC v. NLRB*, 888 F.3d 1305, 1311 (D.C. Cir. 2018). Evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). An ALJ's credibility findings contribute to substantial evidence unless "hopelessly incredible, self-contradictory, or patently insupportable." *PruittHealth-Virginia Park, LLC v. NLRB*, 888 F.3d 1285,

1294 (D.C. Cir. 2018) (citation and internal quotation marks omitted).

Although our standard sets a high bar, ALJ witness credibility determinations are not immune from judicial scrutiny and must be reasonable and reasonably explained. *See Stanford Hosp. & Clinics v. NLRB*, 325 F.3d 334, 337 (D.C. Cir. 2003) ("Decisions regarding witness credibility and demeanor are entitled to great deference, as long as relevant factors are considered and the resolutions are explained." (citation and internal quotation marks omitted)). Our review is not a rubber stamp, and case law reflects at least three grounds that may render an ALJ's credibility decisions unreasonable. This court will not condone arbitrary resolutions that reflect a "lack of evenhandedness." *Sutter East Bay*, 687 F.3d at 437. Nor will we uphold credibility decisions resting "explicitly on a mistaken notion." *Sasol N. Am. Inc. v. NLRB*, 275 F.3d 1106, 1112 (D.C. Cir. 2002). When drawing inferences for and against witness testimony, an ALJ "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *King Elec., Inc. v. NLRB*, 440 F.3d 471, 475 (D.C. Cir. 2006) (quoting *Allentown Mack*, 522 U.S. at 378) (alterations omitted).

We hold that the ALJ witness credibility determinations supporting the conclusion that Cordell threatened Schramm are patently insupportable. *See PruittHealth*, 888 F.3d at 1294. Circus presented six witnesses who regularly attended the weekly safety meeting to rebut testimony from Schramm and Tenney alleging the threat occurred. The ALJ purported to evaluate each witness using criteria drawn from the record and common sense, reasoning that the ability to remember certain details made testimony more reliable overall. But the ALJ applied these criteria unevenly, drew unsupported inferences,

and failed to draw inferences warranted by the record that tended to favor the company's account.

First, the ALJ credited witness testimony with a "lack of evenhandedness." *Sutter East Bay*, 687 F.3d at 437. For instance, the ALJ reasonably inferred that the ability to remember the meeting's date made a witness more credible. Schramm testified the threat occurred during a meeting "getting near" Thanksgiving, either November 21 or November 27, while his corroborating witness, Tenney, testified the meeting occurred "before Thanksgiving," and "possibly the 21st." As to testimony favoring Circus, Cordell remembers a conversation with Schramm and Tenney that occurred on December 6, while other witnesses recalled a conversation between these parties at a safety meeting but did not specify a date. Based on this testimony, the ALJ concluded that Schramm, Tenney, Cordell, and a fourth witness were discussing the same meeting, even though they disagreed as to the date and the contents of the meeting. By contrast, she discredited four other witnesses who supported Circus's account because their testimony did not include a meeting date.[6] The ALJ also emphasized a witness's ability to recall

---

[6] Our dissenting colleague argues that because Schramm and Tenney raised their marijuana smoke concern at multiple meetings, the ALJ reasonably concluded four of Circus's witnesses described a different meeting from the one in question. *See* Dissenting Op. 4. Yet the ALJ found that Schramm and Tenney raised the marijuana smoke concern at two meetings: one in early November, and another in late November or early December. No one testified Cordell attended the first of the two meetings, and Schramm and Tenney testified to a single relevant conversation with Cordell at the second. *See Circus Circus*, 366 NLRB No. 110, at *4. At least three of the four Circus witnesses disregarded by the ALJ specifically recalled a conversation between Schramm, Tenney, and Cordell about marijuana smoke at a safety meeting, and the record includes

specific comments Schramm reported making during the meeting, including noting that Cordell was not a medical professional and describing prior experience with marijuana smoke exposure while employed at another hotel. Yet the ALJ credited Schramm and Tenney for recalling these details but discredited three company witnesses who remembered the same details but also testified Cordell never made a threat. Legitimate adjudication requires evenhanded assessment of testimony offered on behalf of the employer and the employee.

Second, the ALJ found Schramm's version of events "more inherently probable" because "[f]or the witnesses called by [Circus], this was just another weekly safety meeting. For Teeney [sic] and Schramm, it was a memorable occasion." *Circus Circus*, 366 NLRB No. 110, at *4. This inference by the ALJ rests "explicitly on a mistaken notion" that none of the other employees in the safety meeting would remember their manager turning red and threatening to terminate an employee for voicing a workplace complaint. *Sasol N. Am.*, 275 F.3d at 1112 (overturning inference from written notes that failed to stand for the proposition for which the Board cited them); *see also United States ex rel. Exarchou v. Murff*, 265 F.2d 504, 507 (2d Cir. 1959) ("We do not think this finding of impossibility accords with the facts of human life."); *NLRB v. Universal Camera Corp.*, 190 F.2d 429, 430 (2d Cir. 1951) ("[A]s to matters of common knowledge we are to use a somewhat stiffer standard."). Glaringly absent from this analysis are contrary inferences of equal or greater probative value that "the evidence fairly demands," including the possibility that six

_____

evidence of only one meeting at which all three had such a discussion. *See id.* Thus, the ALJ lacked a basis in the record to conclude Circus's witnesses described a phantom third meeting at which Schramm, Tenney, and Cordell discussed marijuana smoke without resorting to threats.

witnesses failed to remember the threat because none occurred. *King Elec.*, 440 F.3d at 475 (quoting *Allentown Mack*, 522 U.S. at 378) (alterations omitted). The ALJ's reasoning again demonstrated "a lack of evenhandedness": she determined that the inherent memorability of a threat favored Tenney's testimony even though he was not threatened, and favored one of the company's witnesses to the extent he remembered a heated exchange, but not to the extent that he also testified the exchange ended without a threat by Cordell. *Sutter East Bay*, 687 F.3d at 437.

Third, of particular concern is the ALJ's failure to draw an adverse inference against Tenney, Schramm's only corroborating witness, based on a fair consideration of record evidence that materially impeached part of his testimony. At the hearing, Tenney testified that he created a contemporaneous record of Cordell's threat on his mobile device by entering the note "[Cordell] threatened carpenter" into the company's electronic work order system known as "HotSOS." Schramm testified that Tenney told him the exact log number of the HotSOS entry created after the threat. Circus immediately produced complete HotSOS records for the date on which Tenney said the meeting occurred. The records showed Tenney made several entries on that day but none that referenced Cordell's conduct toward Schramm or any other threatening conduct. Nevertheless, the ALJ concluded Tenney merely misremembered the date or the substance of the entry and, in any event, that "his testimony was inherently credible and entitled to greater weight than that of witnesses presented by [Circus]." *Circus Circus*, 366 NLRB No. 110, at *4. In reaching this conclusion, the ALJ failed to consider evidence that was certainly a "relevant factor[]" bearing on the credibility determinations at issue. *Stanford Hosp.*, 325 F.3d at 337.

Although the ALJ did not purport to rely on the HotSOS record to credit Tenney, the inconsistency in his testimony "fairly demand[ed]" an adverse inference against the remainder of his account. *King Elec.*, 440 F.3d at 475 (quoting *Allentown Mack*, 522 U.S. at 378). The ALJ's explanations for not discounting the remainder of Tenney's testimony are inadequate. To conjecture that Tenney misremembered a date smacks of the "speculation without a jot of evidentiary support in the record" we have criticized in the past. *Jackson Hosp. Corp. v. NLRB*, 647 F.3d 1137, 1142 (D.C. Cir. 2011). An ALJ's introduction of new reasons to credit testimony is particularly troubling where, as here, agency procedures tightly limited Circus's ability to respond by reopening the record. *See* 29 C.F.R. § 102.48(c)(1) (limiting reopening of the record to "newly discovered evidence" that "would require a different result").[7] Further, describing testimony favoring one party as "inherently credible" notwithstanding a material gap in the witness's account fails to provide a rationale on which to sustain the ALJ's reasoning.

The Board argues that even if the ALJ's analysis is flawed, we should still uphold the Board's finding based on the ALJ's favorable assessment of Schramm's testimonial demeanor

---

[7] As counsel noted at oral argument, the NLRB's limited discovery procedures meant Circus learned of Tenney's alleged HotSOS entry for the first time during the hearing before the ALJ. *See* Oral Arg. at 3:42–4:20. In response, Circus produced Tenney's HotSOS entries for November 21, the date on which he repeatedly claimed to have recorded Cordell's threat against Schramm. *See id.* at 4:41–5:15. It was only after the ALJ issued a recommended decision crediting Tenney that thousands of other November HotSOS entries became relevant as a potential means of rebutting the ALJ's rationale. *See id.* at 5:24–6:00. Circus could not have foreseen this development, and the Board's refusal to reopen the record left the ALJ's error unremarked and unremedied.

during the hearing. Witness demeanor can be valid evidence favoring a given outcome. Here, however, testimonial demeanor is too thin a reed to sustain the ALJ's conclusion. Schramm's testimony is materially contradicted by six witnesses, union members and non-members alike, who remember only an ordinary discussion that concluded without any threats. Schramm's testimonial demeanor alone cannot overcome this strong record evidence. Contrary to the Board's assertions, deference to agency factfinding does not stretch so far. *Cf. Shamrock Foods Co. v. NLRB*, 346 F.3d 1130, 1135 (D.C. Cir. 2003) (finding substantial evidence where the ALJ disbelieved company witnesses and testimony of aggrieved employee was corroborated by a coworker); *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 425–26 (D.C. Cir. 1996) (finding substantial evidence where documentary evidence corroborated employee's testimony and employer witness discredited herself through contradictory statements).

While we do not lightly overrule factual determinations, under these circumstances we conclude there was insubstantial evidence to support the finding that Cordell threatened Schramm at a workplace safety meeting. Accepting the ALJ's determinations here would be inconsistent with the role set out for us by Congress and the Court. *See Universal Camera*, 340 U.S. at 490; *Jones & Laughlin*, 301 U.S. at 47. Accordingly, we vacate this unfair labor practice and need not reach the Board's refusal to reopen the record for additional evidence tending to impeach Tenney's corroborating account.

\*     \*     \*

As with other agencies, the Board must apply existing regulatory standards unless and until it provides a reasoned explanation for a new standard. Here, the Board engaged in unreasoned decisionmaking by finding unfair labor practices

without substantial evidence on the record as a whole and by departing from announced standards in an arbitrary and capricious manner. For the foregoing reasons, we grant the petition for review in full and vacate the Board's order. With respect only to the unlawful termination finding, we remand for further proceedings consistent with this opinion.

*So ordered.*

SRINIVASAN, *Chief Judge*, concurring in part and dissenting in part: I join my colleagues' decision in Part II.B of the court's opinion to remand for the Board to reassess whether Circus terminated Schramm because of his protected activity or instead for valid reasons. I respectfully disagree, though, with my colleagues' decision to set aside the Board's distinct determinations that: (1) Circus violated Schramm's right to union representation during the investigatory meeting with him; and (2) Schramm's supervisor unlawfully threatened him in response to his exercise of statutory rights. Because I would sustain the Board's decision in those respects, I do not join Parts II.A and II.C of the court's opinion.

1. Under the Board's *Weingarten* rule, an employee is entitled "to refuse to submit without union representation to an interview which he reasonably fears may result in his discipline." *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 256 (1975). That right "arises only in situations where the employee requests representation." *Id.* at 257. Under the Board's precedents, an employee will be treated as having requested union representation so as to invoke *Weingarten* "if the language used by the employee is reasonably calculated to apprise the Employer that the employee is seeking such assistance." *Houston Coca Cola Bottling Co.*, 265 NLRB 1488, 1497 (1982). "No magic or special words are required to satisfy this element of the *Weingarten* rationale." *Id.*

My colleagues agree with that understanding of the triggering condition for the *Weingarten* rule. *See* Maj. Op. 11. The sole issue here is whether Schramm's statements at the outset of his investigatory meeting satisfied that condition— i.e., whether his statements qualify as reasonably calculated to apprise Circus that he desired union assistance in the meeting. According to my colleagues, the Board arbitrarily departed from its precedents in concluding that Schramm's statements met that standard. In my view, however, the Board permissibly

determined, consistent with its precedents, that Schramm adequately conveyed his desire for union representation.

Before the meeting, Schramm had been advised by Airth Colin, a human resources representative for Circus, to bring a union steward if he desired representation in the meeting. *Circus Circus Casinos Inc.*, 366 NLRB No. 110, at *1 (June 15, 2018). When Schramm arrived at the meeting, he explained to those present: "I called the union three times [and] nobody showed up, I'm here without representation." *Id.* at *4. Schramm thereby conveyed to Circus's representatives at the meeting (including Colin) that he had attempted to do precisely what he had been advised to do if he desired union representation. In that context, the Board reasonably held Schramm's statements adequate to apprise Circus of his interest in representation. *Id.* at *1.

It is true, as my colleagues observe, that the statements at issue here related facts about past efforts to enlist union assistance. Maj. Op. 11–12. But an employee's statements can both describe recent efforts to secure union representation and simultaneously convey a continuing interest in that representation. The Board reasonably held that to be the case here. After all, why would Schramm relate to Circus's representatives at the outset of the meeting that he had unsuccessfully tried to secure union representation if not because he still desired that assistance, especially given that Circus had advised Schramm to make those very efforts if he desired representation? The Board's precedents hold that an employee's questions such as "Do I need to get somebody in here?" and "Do I need a witness?" qualify as statements reasonably calculated to apprise an employer of a desire for union representation, even absent any reference to a union as such. *See General Die Casters, Inc.*, 358 NLRB 742, 742 (2012); *Bodolay Packaging Mach., Inc.*, 263 NLRB 320, 325

(1982). Schramm's statements here, which specifically referenced union representation, evince a desire for such representation no less clearly. At the least, the Board did not arbitrarily depart from its decisions in so concluding.

My colleagues express a concern that, if Schramm's statements are treated as sufficient to invoke *Weingarten*, he would effectively be denied the choice to proceed without union representation. Maj. Op. 13. I do not understand why that would be the case. When an employee's statements trigger *Weingarten*, the employer can: (i) grant union representation; (ii) deny representation and discontinue the interview; or (iii) deny representation and give the employee the option to continue unrepresented or forgo the interview. *Weingarten*, 420 U.S. at 258–59. The last option specifically recognizes and preserves an employee's ability to choose to go forward without union assistance.

For these reasons, I would sustain the Board's determination that Schramm's statements at the outset of the meeting reasonably apprised Circus of his interest in union assistance so as to trigger the *Weingarten* rule.

2. The Board separately held that Schramm's supervisor, Rafe Cordell, unlawfully threatened Schramm for exercising his statutory rights when Cordell said to Schramm, "maybe we just won't need you anymore," after Schramm raised certain concerns about workplace conditions. *Circus Circus*, 366 NLRB No. 110, at *4. My colleagues overturn the Board's factual finding (specifically, the Board's adoption of the ALJ's finding) that Cordell made that statement. Maj. Op. 23. While my colleagues acknowledge that we review the Board's factual findings under a highly deferential standard, they conclude that this is the rare case in which a finding should be set aside. Respectfully, I disagree.

Schramm testified that Cordell made the contested statement following a discussion about secondhand marijuana smoke during a safety meeting sometime in late November. Those safety meetings were held every Thursday at four different times. Cordell, meanwhile, testified that the relevant discussion occurred at a shift change meeting in early December. Circus produced six witnesses who testified about a meeting touching on the issue of secondhand marijuana smoke. But that was a recurring topic of discussion among employees. Schramm and another Circus employee, Tenney, had raised it during at least two meetings. Consequently, the ALJ first had to determine which Circus witnesses were talking about the relevant meeting before assessing whether Cordell in fact threatened Schramm during it.

In making that determination, the ALJ focused on one detail about which Schramm, Tenney, Cordell, and one other Circus witness all testified: that when Cordell dismissed Schramm's concern about potentially failing a drug test due to secondhand exposure to marijuana smoke, Schramm responded that Cordell was not a medical professional qualified to make that judgment. Because none of the other four witnesses recalled that detail, the ALJ could not definitively conclude that they were discussing the pertinent meeting. In addition, none of Circus's witnesses, aside from Cordell, had been asked about Cordell's statement that Circus may no longer need Schramm's services.

The upshot is that the ALJ faced four Circus witnesses whom she could not definitively conclude were discussing the relevant meeting, and in any event, none of those witnesses had specifically testified about whether Cordell threatened Schramm. The ALJ then concluded that Schramm's and Tenney's testimony about Cordell's threat outweighed the only

directly contradictory testimony:  that of Cordell himself.  In my view, the ALJ's credibility determinations in that regard, adopted by the Board, were not "hopelessly incredible, self-contradictory, or patently insupportable."  *PruittHealth-Virginia Park, LLC v. NLRB*, 888 F.3d 1285, 1294 (D.C. Cir. 2018) (internal quotation marks omitted).