# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 22, 2020  Decided August 4, 2020

No. 19-1101

PACIFIC MARITIME ASSOCIATION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 19-1103, 19-1109, 19-1110

On Petitions for Review and Cross-Applications
for Enforcement of an Order of
the National Labor Relations Board

*Michael E. Kenneally* argued the cause for petitioner. With him on the briefs were *Jonathan C. Fritts*, *Brigham M. Cheney*, and *Thomas A. Lenz*.

*Eric Weitz*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Peter B. Robb*, General Counsel, *David Habenstreit*, Acting Deputy Associate General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

Before: SRINIVASAN, *Chief Judge,* and ROGERS and RAO, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Opinion concurring in part and dissenting in part by *Circuit Judge* RAO.

ROGERS, *Circuit Judge*: The National Labor Relations Board determined that Pacific Maritime Association ("Pacific") and Long Beach Container Terminal ("Long Beach") committed two distinct unfair labor practices in violation of the National Labor Relations Act when they applied disciplinary provisions of one employee's collective bargaining agreement for resolving discrimination complaints to an employee represented by a different union under a collective bargaining agreement with different procedures and remedies. Pacific and Long Beach (hereinafter referred to together as "The Employers"), seek to avoid their statutory obligations by contending that they reasonably interpreted their contractual agreement with the disciplined employee to permit the use of procedures and imposition of penalties that were not included in this agreement, and their disciplinary action did not unilaterally change the terms and conditions of the disciplined employee's employment. In view of the plain text of the Employers' agreement that covered the disciplined employee and the record before the Board, we deny their petitions for review and grant the Board's cross-applications for enforcement of its Order.

## I.

Pacific Maritime Association ("Pacific") and Long Beach Container Terminal ("Long Beach") are involved in shipping, longshore, and cargo-handling industries at ports on the Pacific coast. Pacific is a mutual benefit corporation that serves as the multi-employer bargaining representative for its employer members, with the primary purpose of negotiating, executing, and administering collective bargaining agreements ("CBAs"). One of its members, Long Beach, operates a marine container

terminal at the Port of Long Beach and employs both watchmen and marine clerks. Each classification of employee is represented by a different union, and Pacific has entered into separate agreements with each union. We begin with a summary of those CBAs.

## A.

Watchmen at the Port of Long Beach have long been represented by ILWU, Warehouse, Processing and Distribution Workers Union, Local 26 ("Local 26"). Under the Watchmen's Agreement, Local 26 and Pacific jointly operate a dispatch hall that refers watchmen to work for Pacific's members. Article 18 establishes a procedure for addressing disciplinary issues and other disputes arising under the Agreement. Article 16 of the Agreement broadly prohibits discrimination against "any person" on the basis of "race, color, national origin . . . or political beliefs . . . ." Pursuant to Article 18(C), a Joint Labor Relations Committee of employer and union representatives establishes the rules and penalties governing watchmen's conduct; employers retain an unrestricted right of discipline for five offenses. Otherwise, Article 18(D)(1) requires the employer to "attempt to notify and discuss the alleged incident with the individuals involved" and Local 26. "Following a good faith discussion with the Union, or inability to contact the designated Union representative within a reasonable time period," the employer may file a formal complaint, Article 18(D)(1), or request a meeting with the Joint Committee, Article 18(E). "If a satisfactory settlement cannot be reached" by the Joint Committee, then "either party may refer the matter" to the contractual Watchmen Arbitrator. *Id.* Rules control the arbitration process, including the parties' selection of arbitrators, and rules also limit appeals.

Article 18(H) provides that the "grievance machinery" in the Watchmen's Agreement "shall be the exclusive remedy with respect to any dispute arising under [it] and no other remedies shall be used by the Union, the Employer, or any covered employee until the grievance procedures have been exhausted." Where a disciplinary action affecting a watchman's dispatch right is involved, Article 18(I) specifies that an employer complaint shall only be applicable "to the terminal where the complaint arose." Article 21 states that no provision of the contract "may be amended, modified, changed, altered or waived, except by a written document executed by the parties hereto."

The marine clerks are represented by the International Longshore and Warehouse Union ("the International"). The Pacific Coast Longshore and Clerks' Agreement ("Clerks' Agreement") covers approximately 25,000 longshore workers and marine clerks at Pacific coast ports. This CBA contains its own mechanism for the signatory unions and employers to address disputes regarding covered longshore workers and marine clerks. Notably for present purposes, the Clerks' Agreement includes Section 13.2, which establishes a special grievance procedure for resolving allegations of discrimination or harassment. Under this streamlined procedure, an individual employee may file a complaint, which will be assigned directly to an arbitrator. The arbitrator must promptly schedule an evidentiary hearing to investigate the alleged incident. Within fourteen days after the hearing, the arbitrator shall issue a written decision that includes, as necessary, disciplinary penalties consistent with the guidelines in the Clerks' Agreement. The arbitrator's decision is final, with only limited appeal. In addition to the broad prohibition on discrimination in Section 13.1, side agreements set forth rules of conduct and examples of conduct warranting discipline. In July 2014, Pacific and the International clarified, by letter of

understanding ("2014 LOU"), that Section 13.2 complaints may be brought against "other employees of [Pacific's] member companies," but those outside employees may not file Section 13.2 complaints.

**B.**

The events giving rise to the Board's determination that the Employers had violated the Act began on March 28, 2017. Demetrius Pleas, a watchman represented by Local 26, and a marine clerk represented by the International had a work-related argument during which both men allegedly engaged in racial name-calling. At the time, Pleas was working for Long Beach. The two employees resolved the matter informally that day, but on March 30, 2017, the marine clerk filed a grievance against Pleas pursuant to Section 13.2 of the Clerks' Agreement. Long Beach informed Local 26 the next day that it was investigating the incident and intended, if necessary, to pursue discipline against Pleas under Article 18(C) of the Watchmen's Agreement. Long Beach ultimately concluded that there was insufficient evidence Pleas engaged in wrongdoing to warrant filing a formal Article 18 complaint, but warned Pleas that future incidents would be dealt with through the Watchmen Joint Committee process.

Meanwhile, the Arbitrator assigned to the Section 13.2 grievance scheduled a hearing for May 3, 2017. Counsel for Local 26 wrote Pacific that Local 26 was not bound by Section 13.2 and neither Local 26 nor Pleas would participate in the hearing, and requested that Pacific not take any adverse action against Local 26 members based on these proceedings. Pacific responded by letter that Long Beach and the other Pacific employer members would implement whatever discipline the Arbitrator determined would be appropriate. Neither Pleas nor a Local 26 representative attended the arbitration hearing, but

representatives from Pacific and Long Beach did attend and actively participated. At the beginning of the hearing the Arbitrator stated that he did not "really have authority over Mr. Pleas" pursuant to the Clerks' Agreement and that "it would be up to the Employer to enforce any decision if any if action was needed." Arb. Hr'g Tr. 19–20 (May 3, 2017). Pacific made a statement that the "direct employer" (referring to Long Beach) "is prepared to implement any decision made by the Arbitrator," and that Pleas (the watchman) "is subject to complaints under Section 13.2 of the [Clerks' Agreement] as outlined in the 2014 LOU" between Pacific and the International. Arb. Dec. 3 (June 5, 2017).

The Arbitrator proposed that Pleas be barred from working at Long Beach until a final decision was rendered. In his final decision, the Arbitrator found that Pleas had violated Section 13.2 policies and should be suspended from working at all Pacific employer member terminals for twenty eight days, and also required to undertake an unpaid training video and to sign a statement pledging to abide by Section 13.2 policy before returning to work. *See id.* at 8. Local 26 appealed; the Arbitrator's Order and Decision were sustained, rejecting Local 26's jurisdictional argument. In July 2017, Pacific notified its employer members of Pleas' suspension from working at terminals covered by the Clerks' Agreement.

Local 26 filed unfair labor practice charges against the Employers in May 2017, alleging that they had violated the Act by committing two theoretically distinct unfair labor practices in disciplining watchman Pleas under the Section 13.2 procedure in the Clerks' Agreement: (1) impermissibly modifying the Watchmen's Agreement and (2) unilaterally imposing a new term and condition of employment without bargaining. The Board affirmed the decision of an administrative law judge ("ALJ") that the Employers had

violated Sections 8(a)(5) and (1) of the Act under either of the General Counsel's alternative theories: when they applied Section 13.2 of the Clerks' Agreement, to Pleas, an employee of the watchmen's unit represented by Local 26 and covered by that unit's Watchmen's Agreement, and when they disciplined him pursuant to the Section 13.2 process. *Pac. Mar. Ass'n*, 367 NLRB No. 121, 2019 WL 1977314, at \*1, 4–6 (May 2, 2019). The Employers were ordered to cease and desist, to rescind the suspension and make Pleas financially whole, and, among other things, to delete from their records any reference to his suspension. One Member dissented, arguing the Employers did not apply the Section 13.2 procedure since they did not file the complaint, they reasonably believed the Watchmen's Agreement did not preclude imposing Section 13.2 discipline, and they did not unilaterally change the terms and conditions of Pleas' employment because there was no consistent disciplinary practice. Pacific and Long Beach both petitioned for review of the Board's Decision and Order. The Board filed cross-applications for enforcement of its Order.

## II.

The Board determined that the Employers committed two distinct unfair labor practices: contract modification and unilateral change. These alternative grounds for the Board's Decision involve distinct violations of the Act with different governing standards, defenses, and remedies. *Bath Iron Works Corp.*, 345 NLRB 499, 501–03 (2005), *enforced sub nom. Bath Marine Draftsmen's Ass'n v. NLRB*, 475 F.3d 14 (1st Cir. 2007). The Board has concluded that it may find an unlawful unilateral change, in addition or in the alternative, where it has also found an unlawful contract modification. *See, e.g.*, *Comau, Inc.*, 364 NLRB No. 48, 2016 WL 3853834, at \*4–6 (July 14, 2016). Its counsel explains that "an employer's actions may modify a provision 'contained in' a [CBA] while

also imposing a change to a mandatory bargaining subject where nothing in the contract 'covers' the employer's right to act unilaterally." Resp'ts' Br. 22 (citations omitted).

The Supreme Court has recognized that "the authority of the Board and the law of contract are overlapping, concurrent regimes," and that "the Board may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts." *NLRB v. Strong*, 393 U.S. 357, 360–61 (1969). But neither the Supreme Court nor this court has spoken directly to the question whether the Board has the authority to proceed on different theories of violation based on the same set of facts. Nor need we do so today. The Employers challenge the Board's findings of both statutory violations but they present no challenge to the application of both theories to the same set of facts. Therefore, the court has no occasion to decide whether both unfair labor practices can be properly found in cases of this sort and proceeds on the assumption the Board may do so.

Turning to the Employers' challenges, the scope of the court's review of the Board's decision is limited. As the Supreme Court has long acknowledged, Congress has determined that the Board has "the primary responsibility of marking out the scope . . . of the statutory duty to bargain," *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496 (1979), and "great deference" is due to the Board because determining whether a party has violated this statutory duty is "particularly within" the Board's expertise, *see Crowley Marine Servs., Inc. v. NLRB*, 234 F.3d 1295, 1297 (D.C. Cir. 2000) (quoting *Local 13, Detroit Newspaper Printing & Graphic Commc'ns Union v. NLRB*, 598 F.2d 267, 272 (D.C. Cir. 1979)); *see also Ford Motor*, 441 U.S. at 495. Consequently, this court "must sustain the Board's decision 'unless, reviewing the record as a whole, it appears that the Board's factual findings are not supported by

substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts at issue.'" *S. Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1355 (D.C. Cir. 2008) (quoting *Int'l All. of Theatrical & Stage Emps. v. NLRB*, 334 F.3d 27, 31 (D.C. Cir. 2003)); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951); 29 U.S.C. § 160(e). Reviewing courts may not "displace the Board's choice between two fairly conflicting views," even if the court "would justifiably have made a different choice" in the first instance. *Universal Camera*, 340 U.S. at 488.

Where a challenge is made to the Board's interpretation of a contract, however, the court need give "no special deference" to "ultimate legal conclusions that rest on" the Board's contract interpretations and interprets such contracts *de novo*. *Local Union No. 47, Int'l Bhd. of Elec. Workers v. NLRB*, 927 F.2d 635, 640–41 (D.C. Cir. 1991). The court applies "ordinary principles of contract law." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). Still, the court's deference to the Board's fact-finding extends to findings necessary to interpret the meaning of the contract, "including evidence of intent from bargaining history, and other factual findings on matters bearing on the intent of the parties," as long as those findings are supported by substantial evidence in the record considered as a whole. *StaffCo of Brooklyn, LLC v. NLRB*, 888 F.3d 1297, 1302 (D.C. Cir. 2018) (citations and internal quotations marks omitted).

## A.

An employer violates Sections 8(a)(5) and (1) of the Act by modifying terms and conditions of employment established in a CBA. 29 U.S.C. §§ 158(a)(1), (5), 158(d). Because the unfair labor practice question derives from an employer's statutory duty to bargain, a midterm modification is unlawful

only if it involves a mandatory subject of bargaining for which the employer was required to bargain in the first place. *Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 185–88 (1971). Disciplinary procedures are a mandatory subject of bargaining. *See, e.g.*, *El Paso Elec. Co.*, 355 NLRB 428, 453 (2010), *enforced*, 681 F.3d 651, 662–64 (5th Cir. 2012).

The Board has recognized that an employer has not violated Section 8(a)(5) by modifying terms and conditions of employment under a CBA where the employer has a "sound arguable basis" for its interpretation of a contract and it is not motivated by animus or bad faith. *Bath Iron Works*, 345 NLRB at 502. This exception has limits: no "sound arguable basis" in support of an employer's purported interpretation of the contract can exist where, that interpretation runs "counter to the clear intention of the parties," *id.*, or the contract "cannot be colorably interpreted to permit" the employer's interpretation, *MV Transp., Inc.*, 368 NLRB No. 66, 2019 WL 4316958, at *30 (Sept. 10, 2019).

The Employers contend that they reasonably believed enforcing Section 13.2 of the Clerks' Agreement against watchman Pleas was consistent with the Watchmen's Agreement under which Pleas was covered. In their view, they did not modify the Article 18 procedures because no employer had filed the complaint as is contemplated by the Watchmen's Agreement; rather a marine clerk covered by the Clerk's Agreement filed the complaint. So, in their view, it was reasonable to interpret Article 18(D) regarding exhaustion requirements to apply only in cases in which an employer files a complaint. For the same reasons, they contend that there was no modification of Article 18(H), which provides that Article 18's grievance procedures are the exclusive remedy with respect to any dispute arising under the Watchmen's

Agreement, because the dispute was initiated by the marine clerk and arose under the Clerks' Agreement.

But as the Board concluded, Article 18 of the Watchmen's Agreement cannot be colorably interpreted to permit the Employers to unilaterally impose an alternative disciplinary procedure contrary to the exclusive procedure in that CBA, or to affirmatively grant the Employers the right to impose alternative disciplinary procedures unilaterally. First, the Employers' view that Article 18 of the Watchmen's Agreement did not limit their ability as employers to discipline Pleas for racial harassment is implausible on the face of the plain terms of the CBA. Article 18(H) expressly limits the Employers' ability to discipline employees "with respect to any dispute arising under the [Agreement]" unless the "grievance procedures have been exhausted." Pleas' alleged misconduct arose under the Agreement — specifically, Article 16's anti-discrimination provision, which broadly prohibits discrimination against "any person" on the basis of "race, color, national origin, religious or political beliefs, sex, age, Veteran's status, or disability." Given the plain express terms of the Watchmen's Agreement, an employer who seeks to discipline a covered employee for conduct prohibited by Article 16, must exhaust the grievance procedures in Article 18 before pursuing other disciplinary remedies. *See Pac. Mar. Ass'n*, 367 NLRB No. 121, 2019 WL 1977314, at *5 & n.18, 20. Such procedures include filing a complaint after attempting to informally resolve the dispute with Local 26, Article 18(D)(1), or meeting with the Joint Committee and if a satisfactory settlement cannot be reached, referring the matter to the Watchmen Arbitrator, Article 18(E). The Employers did neither, and Long Beach expressly acknowledged the applicability of Article 18 procedures in declining to file a complaint against Pleas. The employers, therefore, could not reasonably conclude that, without first exhausting these

procedures, enforcing Section 13.2 of the Clerks' Agreement against watchman Pleas was consistent with the Watchmen's Agreement under which he was covered.

The Employers press on, contending that Article 18(C) affirmatively grants employers the right to unilaterally discipline Pleas for racial harassment. This too is facially implausible. The plain text of Article 18(C) limits the employers' unrestricted right of discipline to the specific offenses involving "intoxication, pilferage, assault, incompetency, or failure to perform work as directed." Pleas' misconduct did not fall within these five offenses. Reading Article 18(C) to provide the employers an open-ended right to unilaterally discipline, as the Employers do, would effectively render the enumeration of offenses superfluous and Article 18's established disciplinary procedures largely meaningless.

With Article 18(H) so understood, the Employers lacked a sound arguable basis for interpreting the CBA to permit their disciplinary action. Stark differences between the exclusive Article 18 grievance procedures and the Section 13.2 procedure applied by the Employers compel this conclusion. In a contract modification case, the dispositive issue is whether the Employers "had a 'sound arguable basis' for [their] actions," *Bath Iron Works*, 345 NLRB at 503. Here, the Employers interpreted their CBA with Local 26 to permit a marine clerk, covered by a different CBA, to refer his dispute with Pleas to arbitrators identified under the special Section 13.2 Grievance process and to permit the Employers to impose the Arbitrator's discipline that exceeded the discipline allowed under the CBA that covered Pleas, and to do so without first exhausting the Article 18 procedures. The Employers' conduct in imposing discipline was inconsistent with the exclusive provisions of Article 18, such as Article 18(E), which provides that the Employers may refer grievances to the "Watchmen Arbitrator,"

who is jointly selected and appointed by the Employers and Local 26, if a satisfactory settlement cannot be reached with the Joint Committee. Even if the marine clerk could properly file a complaint against watchman Pleas under Section 13.2, that did not mean the Employers could ignore their CBA with Local 26 that covered Pleas. Therefore, they fail to show that the Board erred in rejecting their attempt to come within the scope of the sound arguable basis exception for contract interpretation.

Second, the Employers maintain that the basic premise of the Board's Decision, that they applied Section 13.2 against Pleas, is belied by the record. It is true that the Section 13.2 procedures were initially invoked and pursued by the marine clerk, and not initiated by an employer. But the Board's finding that the Employers actively participated before, during, and after the Section 13.2 arbitration hearing is supported by substantial evidence in the record considered as a whole. That evidence effectively rendered the marine clerk's complaint the Employers' complaint. Long Beach suggests it merely observed the arbitration proceeding and did not enforce the Arbitrator's order. But at the hearing, Pacific represented to the Arbitrator, without objection, that Long Beach was Pleas' direct employer and stood ready to carry out any discipline recommended by the Arbitrator, and that Pleas was subject to the Section 13.2 procedures under the 2014 LOU between Pacific and the International. Participating in this Section 13.2 arbitration proceeding was inconsistent with the terms of Pleas' Watchmen's Agreement for addressing discrimination complaints. Furthermore, the Employers "implemented the resulting discipline," Pet'rs' Br. 47, by notifying all member terminals of Pleas' suspension. That action, among others, resulted in penalties beyond those authorized under the Watchmen's Agreement. For example, when Pleas was dispatched in July 2017 for a job at Hanjin Terminal, a covered

terminal under the Watchmen's Agreement, he was ordered to leave.

Third, the parties' bargaining history and past practice further support the Board's conclusion that the plain language of the Watchmen's Agreement does not permit or authorize the Employers to discipline a Local 26 watchman using the special Section 13.2 procedure. In evaluating an employer's sound arguable basis, the Board may examine "both the contract language itself and relevant extrinsic evidence," such as bargaining history or past practice to determine the parties' intent, *Knollwood Country Club*, 365 NLRB No. 22, 2017 WL 1088796, at *1 (Mar. 8, 2017), and the Board has repeatedly relied on extrinsic evidence to support its sound arguable basis analysis, *see, e.g.*, *id*. at *1 & n.8; *see also ADT, LLC*, 369 NLRB No. 31, 2020 WL 996271, at *5 & n.10 (Feb. 27, 2020); *see also Comau*, 364 NLRB No. 48, 2016 WL 3853834, at *5 & n.16. The Board's analysis here is in line with its precedent. The Board first determined that the "clear language" of Article 18 prohibited the Employers' disciplinary action and then explained how the parties' past practice and bargaining history supported this finding. *Pac. Mar. Ass'n*, 367 NLRB No. 121, 2019 WL 1977314, at *5.

There is substantial evidence to support the Board's finding that Local 26 consistently rejected the Employers' proposals to incorporate procedures similar to a Section 13.2 procedure into the Watchmen's Agreement. During negotiations in 2008 and 2014, the Employers proposed that a Section 13.2 procedure be added to the Watchmen's Agreement and Local 26 repeatedly rejected these proposals. The Employers suggest that the Board has mischaracterized the record evidence because the parties never bargained over whether a non-watchman could use Section 13.2 to accuse a watchman of workplace harassment. Yet evidence credited by

the ALJ indicated that in October 2014 Pacific proposed to amend Article 16 to allow "*any* employee" to file a Section 13.2 type grievance, General Counsel Ex. 5 (Employer Proposals: Article 16 (Oct. 8, 2014)) (emphasis added), and Local 26 rejected this proposal.

There also is substantial evidence to support the Board's finding that the parties have historically used Article 18 procedures to resolve complaints of worker-versus-worker harassment. Sometimes this has been done informally with Local 26; other times it has been done through the formal complaint process. In the instant case, Long Beach notified Local 26 of its investigation into the discrimination allegations, and later issued Pleas an informal warning that future such occurrences would be resolved through the Article 18 disciplinary process. Long Beach's general manager testified that he had had informally resolved at least two dozen similar harassment complaints by issuing warning letters. In 2016, when Long Beach filed a formal Article 18 complaint against a watchman accused of harassing another watchman in violation of Article 16, the matter was resolved by the Joint Committee.

Still, the Employers maintain that the evidence fails to support the Board's position that Article 18 is the exclusive means for addressing these types of complaints. Putting aside the fact that Article 18(H) clearly states as much, the Employers point to no record evidence that the parties intended for the Employers to have a unilateral right to enforce Section 13.2 against covered watchmen accused of discrimination. It is undisputed that the parties have not previously resolved worker-versus-worker harassment allegations in this way. The Board could properly conclude, therefore, that the Employers had no sound arguable basis to believe that their Section 13.2

disciplinary action was consistent with the Watchmen's Agreement.

Fourth, the Employers maintain that Local 26 is not entitled to override the Employers' agreements with other unions and other workers' rights under these agreements. They misconstrue federal labor law and principles of contract law. The Act establishes a system of exclusive collective-bargaining representation in which employers are statutorily obligated to bargain with their employees' chosen representative over subjects such as employee disciplinary procedures. *See* 29 U.S.C. §§ 158(a)(5), 159(a); *see generally First Nat. Maint. Corp. v. NLRB*, 452 U.S 666, 674–79 (1981). The Employers speculate that if they had refused to enforce Section 13.2, then the Board would have entertained contract modification charges from the marine clerk's union. Even if that were true, which we need not decide, it does not change the Employers' statutory and contractual obligations to Local 26.

"[A] contract cannot bind a nonparty." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). Local 26, the watchmen employees' union, was not a party to the Clerks' Agreement. Neither was there evidence that Local 26 had acted in a manner as would give the Employers reason to conclude that Local 26 had agreed, albeit informally and not in writing as Article 21 contemplated, to the use of Section 13.2 procedures where a non-watchman files a complaint against a covered watchman, nor any other evidence that the Agreement permitted this departure from Article 18 procedures. Local 26 is apparently the last holdout among unions with which Pacific contracts to use Section 13.2 procedures, most recently in negotiations for the 2014-2019 Watchmen's Agreement. The Employers point to no conduct by Local 26 that provided a basis for them to conclude that the Agreement would permit using Section 13.2 procedures against watchman Pleas.

In sum, this contractual defense, much like the Employers' others, ignores the plain text of the Watchmen's Agreement, the parties' bargaining history, and their negotiations for the 2014-2019 contract where Local 26 again rejected the Employers' proposal to import the special Section 13.2 disciplinary procedure in the Clerks' Agreement into the Watchmen's Agreement. The remainder of the Employers' challenges to the contract-modification violation fail because the Board's findings are supported by substantial evidence in the record considered as a whole.

Our dissenting colleague changes the question before the court. To avoid the plain text of the Watchmen's Agreement covering Pleas, the dissent defines the relevant question as whether the Employers had "a sound arguable basis for concluding that employee discipline may occur before or apart from filing an employer grievance under the Watchmen's Agreement." Dis. Op. 13; *see also id.* 2, 16. The answer provided distorts the standard adopted by the Board for the sound arguable basis exception, and it does not meaningfully engage with the Employers' disciplinary action against Pleas nor with Article 18(H)'s exclusivity and exhaustion requirements, much less Article 18's provisions on individual cases of employee discipline. Not only does Article 18(H) provide that the Article 18 procedures are the "exclusive remedy with respect to *any* dispute arising under the [Watchmen's Agreement]," *id.* (emphasis added), but Article 18(D) regarding employer complaints of employee discipline, provides that Employers "may implement the established procedures as outlined in Articles 18 and 19 of Agreement," Article 18(D)(1). Article 18(D)(1) requires the Employers to participate in a good faith discussion with Local 26 prior to implementing the Article 18 procedures, namely referring a matter to the Joint Committee, Article 18(E), or filing a formal complaint, Article 18(D); there is no exception to Article

18(H)'s exclusivity and exhaustion requirements. To the extent our colleague interprets Article 18(H) to mean that the Pleas disciplinary incident did not "aris[e] under" the Watchmen's Agreement, this interpretation also flounders on the plain text. And in responding to the dissent by pointing to the plain text's statement of what Article 18(H)'s exclusivity entails, the court does not create a rationale for denying the petitions other than the Board's reliance on Article 18.

Authority involving a different context and different contract terms does not advance the dissent's position. *See* Dis. Op. 10–11. For example, in *Nolde Bros., Inc. v. Local No. 358*, 430 U.S. 243 (1977), the Supreme Court considered whether an arbitration clause in a CBA that required the parties to arbitrate "any grievance" arising between the parties applied to a contractual dispute over severance pay that arose after the contract's termination. *Id.* at 244–45, 248–49. Moreover, even applying the reasoning in *Nolde Brothers* to Article 18(H), the Court's interpretation of "arising under" supports the Board's conclusion that the Employers lacked a sound arguable basis for their disciplinary action, which was precluded by the plain text of the Watchmen's Agreement.

Nor does resolution of whether Pleas' conduct violated the no-discrimination provision of Article 16 "hinge[] on the interpretation ultimately given" by the Arbitrator to the Section 13.2 policy of the Clerks' Agreement, *Nolde Bros.*, 430 U.S. at 249, because the present dispute does not cease to arise under the Watchmen's Agreement simply because the Employers chose not to determine whether Pleas violated Article 16 of that Agreement using Article 18 procedures and instead chose to apply the different procedures and penalties in the Clerks' Agreement, enforcing Section 13.2 remedies in the Arbitrator's order. The Employers did not challenge the Board's internal

operating procedures using three-member panels, *see* Dis. Op. 19, and consequently that issue is not properly before the court, *see* 29 U.S.C. § 160(e).

**B.**

An employer violates Sections 8(a)(5) and (1) "by unilaterally changing an existing term or condition of employment without first bargaining to impasse." *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 309 & n.5 (D.C. Cir. 2003). The General Counsel must show that "there is an employment practice concerning a mandatory bargaining subject, and that the employer has made a significant change thereto *without bargaining*." *Bath Iron Works*, 345 NLRB at 501 (emphasis in original). Disciplinary procedures are a mandatory subject of bargaining. *See, e.g.*, *El Paso Elec.*, 355 NLRB at 453.

The Employers contend that the Board's finding that there was a significant change to an established employment practice is not supported by substantial evidence. They assert that allegations of worker-versus-worker discrimination were not previously addressed in any consistent way and were often handled outside of Article 18's process. But the record before the Board shows that the parties had consistently utilized the established Article 18 disciplinary procedure in the Watchmen's Agreement to discipline bargaining unit employees and that this included the informal resolution of disputes prior to the issuance of formal employer complaints. *See, e.g.*, Bill Carson testimony, ALJ Hr'g Tr. 465–66 (Apr. 17, 2018); Letter of March 31, 2017, from Long Beach General Manager Bill Carson to Luisa Gratz, Local 26 President; Letter of April 27, 2017, from Long Beach to Pleas. Indeed, as noted, even in the present case Long Beach acknowledged that if Pleas were to be formally disciplined, it would be pursuant to the

Watchmen's Agreement. Although there is no evidence of an established practice for handling inter-union employee complaints, the Employers acknowledge that a non-Local 26 employee had never filed a harassment complaint against a watchman. Pet'rs' Br. 53. Absent established disciplinary practices to resolve this type of dispute, the Employers' decision to enforce Section 13.2 against a covered watchman was a change in practice and itself a deviation from the *status quo* that supports the Board's determination that there was a unilateral change without bargaining. *See NLRB. v. Katz*, 369 U.S. 736, 744–47 (1962); *Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 375–76 (D.C. Cir. 2017). *Cf. E.I. Du Pont De Nemours & Co. v. NLRB*, 682 F.3d 65, 67–68 (D.C. Cir. 2012).

The Employers' invocation of the contract coverage doctrine fares no better. The court has interpreted the "contract coverage" standard in unilateral-change cases to present the question whether a union has already "exercise[d] its right to bargain" by memorializing in a contract the employer's right to act unilaterally, thereby removing the covered action from the range of further mandatory bargaining. *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993) (quoting *Local Union No. 47*, 927 F.2d at 640). The evidence does not show that Local 26 ever "surrendered the[] right to bargain over the . . . change[] through either waiver or contract." *Wilkes-Barre Hosp.*, 857 F.3d at 376 (quoting *S. Nuclear Operating*, 524 F.3d at 1357).

The Employers maintain that the Board's ruling must be vacated because the Board applied a "clear and unmistakable waiver" standard and the Board recently ruled that the "contract coverage" doctrine is the appropriate mode of analysis, *MV Transp.*, 368 NLRB No. 66, 2019 WL 4316958, at *1. The Board noted that application of the "contract coverage" standard would not require a different result. *Pac.*

*Mar. Ass'n*, 367 NLRB No. 121, 2019 WL 1977314, at \*6 n.21. Even so, the Employers maintain that the Board failed to explain, under the contract coverage doctrine, why procedures related to employee discipline in the Watchmen's Agreement did not encompass the Employers' decision to apply Section 13.2 to Pleas. Yet after reviewing the text of the Watchmen's Agreement, the parties' bargaining history, and the parties' past practice, and concluding that the Employers had no sound arguable basis for their interpretation of the Agreement, the Board also concluded that the Agreement did not cover the Employers' disciplinary action. *Id.* at \*5–6 & n.21. Given the overlap between the sound arguable basis and contract coverage analysis, (as conceded by the Employers, *see* Oral Arg. Tape 6:55–8:17 (Jan. 22, 2020)), the Employers fail to demonstrate that the Board's explanation was deficient.

To conclude that a CBA covers the challenged unilateral conduct, the conduct must fall "within the compass or scope of contract language granting the employer the right to act unilaterally." *MV Transp.*, 368 NLRB No. 66, 2019 WL 4316958, at \*17; *see also Wilkes-Barre Hosp.*, 857 F.3d at 377. In the Employers' view, their conduct falls "within the compass" of the Watchmen's Agreement even if the Agreement does not specifically authorize discipline pursuant to Section 13.2 because the Agreement grants an "unrestricted unilateral right to impose discipline for a number of broadly stated reasons" and "any dispute over the propriety of Pleas's discipline falls 'within the compass' of the Watchmen's Agreement." Pet'rs' Br. 59–60. As noted, Pleas was not disciplined for any of the exempted offenses in Article 18(C), and disciplinary disputes falling within the terms of Article 16 of the Watchmen's Agreement are governed by Article 18's procedure, which is exclusive and does not encompass Section 13.2. Given the text of the Watchmen's Agreement and the Employers' bargaining history with Local 26, their attempt to

stretch the Agreement to cover the Section 13.2 discipline is implausible at best. Although the contract coverage standard does not require that the parties' Agreement "specifically mention" the disciplinary action at issue, *see Wilkes-Barre Hosp.*, 857 F.3d at 377 (quoting *Enloe Med. Ctr. v. NLRB*, 433 F.3d 834, 839 (D.C. Cir. 2005)), nor does it mean an employer can unilaterally change the terms and conditions of employment without bargaining because they fall within a broad subject area that the parties' Agreement had addressed in other respects, *cf. id.* at 376–77. The Employers' interpretation of the Watchmen's Agreement would render its long-familiar and carefully bargained-for terms meaningless by achieving the modification of the Agreement that Local 26 had repeatedly rejected during bargaining with Pacific. This approach is contrary to the Employers' statutory obligations under Sections 8(a)(5) and (d) of the Act to adhere to the terms of the Agreement and effectively dismisses the Supreme Court's reasoning on the importance of abiding by the parties' Agreement, *see First Nat. Maint. Corp.*, 452 U.S. at 674.

In sum, assuming that both of the theories for violation can be applied, the court sustains the Board's determinations that the Employers made both a midterm contract modification and a unilateral change to the terms and conditions of Pleas' employment. The Board could properly conclude, in view of the plain text of the Watchmen's Agreement, that there was no "sound arguable basis" for the Employers to apply the Clerks' Agreement Section 13.2 procedures and enforce the Arbitrator's order against Pleas, who was covered under the Watchmen's Agreement. And, by so doing, the Employers unlawfully unilaterally changed the terms and conditions of Pleas' employment. Accordingly, the court denies the petitions for review and grants the Board's cross-applications for enforcement of its Order.

RAO, *Circuit Judge*, concurring in part and dissenting in part: The National Labor Relations Board ("NLRB" or "the Board") found the employers in this case violated federal law by committing two unfair labor practices: first, unlawfully modifying a collective bargaining agreement without union consent; and second, unilaterally imposing new terms and conditions of employment without providing the union notice and an opportunity to bargain. While the majority enforces both unfair labor practices, I would vacate the contract modification finding. The Board may find a contract modification only when an employer violates a specific contractual term that plainly bars the actions taken. Because the relevant collective bargaining agreement is silent or at least ambiguous as to the discipline imposed in this case, the employers had reasonable grounds for their disciplinary actions under the "sound arguable basis" standard. This well-established standard ensures that the Board does not overreach into ordinary labor contractual disputes that Congress placed firmly within the jurisdiction of the federal courts. Because the majority relaxes longstanding standards for contract modification, I respectfully dissent from Part II.A of the court's opinion.

I.

The majority carefully sets out the relevant facts, Maj. Op. 2–7, but I would frame this contractual dispute in a somewhat different way. The Long Beach Container Terminal and the Pacific Maritime Association ("the Employers") entered into a collective bargaining agreement known as the Watchmen's Agreement with ILWU, Warehouse, Processing and Distribution Workers' Union, Local 26 ("the Union"). The Union represents watchmen at the Employers' port facilities. Demetrius Pleas was a member of the Union and thus subject to the Watchmen's Agreement. Marine clerks at the port facilities are represented by a different union operating under a different contract, the Pacific Coast Longshore and Clerks' Agreement ("Clerks' Agreement"). When Pleas made racially

insensitive comments in the workplace, a marine clerk filed a complaint under Section 13.2 of the Clerks' Agreement, which sends discrimination complaints to an arbitrator to resolve factual disputes and recommend appropriate discipline. The Employers allowed the clerk's complaint against Pleas to proceed under Section 13.2 and imposed the arbitrator's recommended discipline. Both the Board and the majority emphasize that the Employers used the wrong mechanism when disciplining Pleas because they should have filed a grievance under Article 18 of the Watchmen's Agreement rather than use the Section 13.2 process. *Pac. Mar. Ass'n*, 367 NLRB No. 121, at \*5–6 (May 2, 2019); *see* Maj. Op. 9–19.

The distinction between Section 13.2 of the Clerks' Agreement and Article 18 of the Watchmen's Agreement, however, is a red herring. The contract modification charge does not turn on whether the Employers disciplined Pleas pursuant to the Section 13.2 process. Rather, the dispositive issue is whether the Watchmen's Agreement allows the Employers to impose discipline at their discretion or instead requires the Employers to discipline Union members exclusively through an Article 18 grievance. Thus, my analysis focuses on whether the Employers justified disciplining Pleas under a reasonable interpretation of the Watchmen's Agreement—a burden they readily carried here—and whether the Board respected limitations on its jurisdiction by adjudicating this case under the appropriate legal standard.

Understanding the Board's limited authority over contractual matters requires recollecting the distinction between unfair labor practices under the National Labor Relations Act of 1935 ("NLRA") and breaches of contract under the Labor Management Relations Act of 1947 ("LMRA"), a distinction the majority overlooks. The NLRA creates public rights related to collective bargaining and

empowers the Board to adjudicate unfair labor practices infringing those rights. Section 8(a)(5) and (1) of the NLRA make it unlawful for an employer to "refuse to bargain" with employee representatives on wages, hours, and other mandatory subjects of bargaining. 29 U.S.C. § 158(a)(5), (1). Section 8(d) protects the integrity of the collective bargaining process by prohibiting parties from "terminat[ing] or modify[ing]" provisions "contained in" a collectively bargained agreement. *Id.* § 158(d), (d)(4). The Board's authority over matters of contract extends only as far as adjudicating unfair labor practices. Traditional contractual disputes, by contrast, are reserved for the federal courts under Section 301 of the LMRA, which recognizes that collective bargaining agreements are voluntary contracts between employers and unions giving rise to private rights when breached. To vindicate contractual rights, the LMRA grants district courts broad jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a); *see Dist. No. 1 v. Liberty Mar. Corp.*, 933 F.3d 751, 756–58 (D.C. Cir. 2019).

The jurisdictional division between the NLRA and the LMRA means the Board interprets contracts only "so far as [is] necessary" to determine whether an unfair labor practice occurred. *Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 119, 124 (D.C. Cir. 2001) (quoting *NLRB v. C&C Plywood Corp.*, 385 U.S. 421, 428 (1967)). "But the federal courts, not the Board, are legislatively empowered to be the primary interpreters of contracts." *Id.* (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202–03 (1991)). Under prevailing standards for contract-related unfair labor practices and associated defenses, the Board performs a "limited review" of a labor contract's plain language to determine whether to assert jurisdiction. *MV Transp., Inc.*, 368 NLRB No. 66, at *17 (Sept. 10, 2019). Resolving contractual ambiguity by reaching beyond the plain

meaning, however, is a task reserved for the courts. As the agency freely admits, "the Board is not an expert in contract interpretation, nor was it intended to be." *Id.* at \*9 (cleaned up). When contractual obligations are in dispute, "[t]he Board is not the proper forum for parties seeking an interpretation of their collective-bargaining agreement." *Vickers, Inc.*, 153 NLRB 561, 570 (1965). That much flows from the bargaining structure of the NLRA, which leaves employers and unions free to set the terms and conditions of employment by mutual consent rather than administrative fiat. Orders of the Board are "ineffective to determine any private rights of the employees and leave[] them free to assert such legal rights as they may have acquired under their contracts." *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 366 (1940); *cf. Stern v. Marshall*, 564 U.S. 462, 484 (2011) ("[I]n general, Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'") (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)).

Jurisdictional considerations thus operate in the background of the Board's adjudication of contract modification charges under Sections 8(a)(5) and (d). Judicial review of such cases ensures the Board respects limits on its authority and does not decide breach of contract claims that Congress assigned to the courts. Accordingly, we review the Board's contract interpretation de novo while according substantial evidence deference to the agency's findings of fact. *StaffCo of Brooklyn, LLC v. NLRB*, 888 F.3d 1297, 1302 (D.C. Cir. 2018). To determine whether the Board misapplied governing law in an arbitrary and capricious manner, "we must identify the standard at issue, examine its application in prior adjudications, and then determine whether the instant case is a faithful application of existing law or instead a *sub silentio*

revision." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 476 (D.C. Cir. 2020).

## II.

As the Board has explained on multiple occasions, contract modification and unilateral change unfair labor practices "are fundamentally different in terms of principle, possible defenses, and remedy." *ADT, LLC*, 369 NLRB No. 31, at \*3 (Feb. 27, 2020); *MV Transp.*, 368 NLRB No. 66, at \*27–28; *Bath Iron Works Corp.*, 345 NLRB 499, 501 (2005). In this case, the Board found that the Employers both unilaterally changed established practice and modified the Watchmen's Agreement by imposing terms from Section 13.2 of the Clerks' Agreement. *Pac. Mar.*, 367 NLRB No. 121, at \*5–6. In doing so, the Board contradicted precedents that foreclose finding both unilateral change and contract modification based on the same underlying employer conduct.[1] Because the Employers

---

[1] Although our court has yet to definitively address the issue, the Board's precedents have long treated contract modification and unilateral change as mutually exclusive. Contract modification charges "require greater proof" because their remedy—specific performance of the contract's terms—is more severe than that assessed for the "lesser allegation" of unilateral change. *ABF Freight Sys., Inc.*, 369 NLRB No. 107, at \*4 & n.8 (June 19, 2020) (citing *Bath Iron Works*, 345 NLRB at 502–03). In rare situations, the Board has found both violations when an employer imposed multiple rules at the same time, some of which modified an existing contract and some of which altered established practice. *See, e.g.*, *Comau, Inc.*, 364 NLRB No. 48, at \*4–6 (July 14, 2016). Since deciding this case, the Board has reaffirmed that the findings are mutually exclusive: "Unlike an employer that unlawfully modifies a contract, an employer that implements an unlawful unilateral change only needs to restore the status quo ante until the parties reach an impasse in bargaining. Because the remedies are mutually exclusive, an allegedly unlawful employer decision cannot be *both* a unilateral

failed to challenge the joint nature of the findings, however, we cannot vacate the Board's order on this basis. 29 U.S.C. § 160(e); *see* Maj. Op. 8.

On these facts, I join the majority in enforcing the Board's unilateral change finding because the Employers imposed new terms and conditions of employment without giving the Union notice and an opportunity to bargain. *Pac. Mar.*, 367 NLRB No. 121, at *6; *see* Maj. Op. 19–22. Unilateral changes to prior practices violate Sections 8(a)(5) and (1) by circumventing the Section 8(d) procedural protections meant to promote collective bargaining. *NLRB v. Katz*, 369 U.S. 736, 743 (1962). To prove a unilateral change, the Board must show (1) "an established past practice" and (2) "'a material, substantial, and significant change'" to that practice without bargaining. *ABF Freight Sys., Inc.*, 369 NLRB No. 107, at *2 (June 19, 2020) (quoting *MV Transp.*, 368 NLRB No. 66, at *4). Substantial evidence supports the Board's view that the Employers had established past practices of investigating discrimination allegations against watchmen informally and imposing less severe penalties than those levied against Pleas. By participating in and adopting the results of procedures from Section 13.2 of the Clerks' Agreement, the Employers made material changes to employee discipline, an employment term recognized as a mandatory subject of bargaining. *See El Paso Elec. Co.*, 355 NLRB 428, 453 (2010).

Yet these same facts do not support a contract modification violation, which turns on matters of contract interpretation for which the Board has considerably less prerogative and enjoys

---

change *and* a contract modification." *ADT*, 369 NLRB No. 31, at *3 (citing *Bath Iron Works*, 345 NLRB at 503). While the NLRB's general counsel may allege both theories in the alternative, the Board will not find both violations simultaneously. *Id.*

no judicial deference. Contract modification is an unfair labor practice under Sections 8(a)(5) and (d) because failing to adhere to agreed-upon terms undermines collective bargaining and a union's role as the employees' chosen representative. To find contract modification, the Board must (1) identify "a specific term 'contained in' the contract" to which a party failed to adhere without the consent of the counterparty, *United Auto. Workers v. NLRB*, 765 F.2d 175, 179 (D.C. Cir. 1985) (quoting 29 U.S.C. § 158(d)(4)), and (2) assess the four corners of the agreement to determine whether the charged party has a "sound arguable basis" for interpreting the contract to support its actions, *Bath Iron Works*, 345 NLRB at 502. Under the "sound arguable basis" standard, an alleged breach of contract is not an unfair labor practice if the party acted under a "reasonable" interpretation of the contract. *MV Transp.*, 368 NLRB No. 66, at *28. "[W]hen 'an employer has a sound arguable basis for ascribing a particular meaning to his contract and his action is in accordance with the terms of the contract as he construes it,' the Board will not enter the dispute to serve the function of arbitrator in determining which party's interpretation is correct." *NCR Corp.*, 271 NLRB 1212, 1213 (1984) (quoting *Vickers*, 153 NLRB at 570). In other words, only clear violations of an unambiguous term rise to the level of an unlawful contract modification.

In finding contract modification on these facts, the Board departed from longstanding precedent in three ways. First, the Board failed to identify a specific contract provision "contained in" the Watchmen's Agreement that the Employers modified. Second, the Board misapplied the "sound arguable basis" standard by rejecting the Employers' reasonable interpretation of the Watchmen's Agreement as allowing employee discipline outside the Article 18 grievance process. Third, by relying on extrinsic evidence of bargaining history, the Board transgressed the limitations on its contract interpretation

authority. In my view, any one of these errors requires vacating the contract modification finding. Taken together, they represent a troubling departure from applicable standards and undermine the clarity and predictability of federal labor law.

A.

To determine whether the Employers unlawfully modified the contract, the Board was required first to identify a specific term "contained in" in the Watchmen's Agreement that the Employers ignored without the Union's consent. *United Auto. Workers*, 765 F.2d at 179; *see also St. Vincent Hosp.*, 320 NLRB 42, 42 (1995); *Milwaukee Spring Div.*, 268 NLRB 601, 602 (1984). The Board concluded the Employers modified Articles 18(D) and (H) by disciplining Pleas after arbitration under Section 13.2 of the Clerks' Agreement rather than filing an employer grievance under Article 18 of the Watchmen's Agreement. *Pac. Mar.*, 367 NLRB No. 121, at *5–6. Although employee arbitration under Section 13.2 was a departure from prior practice and thus an unlawful unilateral change, this does not necessarily mean the Employers modified Article 18 when they adopted the results of arbitration. Instead, the ultimate question is whether the Watchmen's Agreement requires the Employers to discipline Pleas exclusively through Article 18's "Grievance Machinery." Watchmen's Agreement at 33 ("W.A."). For the following reasons, the Watchmen's Agreement provisions identified by the Board do not require the Employers to discipline employees exclusively through an employer grievance under Article 18.

As an initial matter, "grievance" is a term of art in the collective bargaining context that means more than a "complaint" or "dispute." As the Supreme Court has explained, "[t]he processing of disputes through the grievance machinery is actually a vehicle by which meaning and content

are given to the collective bargaining agreement." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581 (1960). The Watchmen's Agreement grievance machinery is a specific type of complaint process that covers some, but not all, disputes arising between employees and the Employers. Article 18(D) requires the Employers to attempt informal resolution with affected parties before submitting a "grievance" to the joint Labor Relations Committee.[2] If the Committee is unable to negotiate a resolution, the matter may proceed to arbitration between the Employers and the Union. W.A. at 33–34; *see also* Art. 18(E)–(G), W.A. at 34–35. Nothing in Article 18(D) requires or suggests that the

---

[2] Article 18(D) reads, in relevant part:

> Prior to a complaint being filed by the Employer or the Union, the following procedures shall apply:
>
> (1.) (A.) The Employer shall notify and discuss the alleged incident with the individuals involved and president and/or a steward of [the Union] and attempt to resolve the matter. Whatever evidence the parties have or have relied upon relating to the discharge and/or grievance shall be provided to the Union at the time of request. … Following a good faith discussion with the Union, … the Employers may implement the established procedures as outlined in Articles 18 and 19 of the Agreement.
>
> (B.) The Union shall notify and discuss the alleged incident with management and attempt to resolve the matter. … Following a good faith discussion with the Employer, … the Union may implement the established procedures as outlined in Article[s] 18 and 19 of the Agreement.
>
> (2.) In cases of discipline and/or discharge, the Employer shall identify, specifically, and describe in detail the violation committed by the watchman. The Employer shall specify the company procedure and/or Contract provision violated.

Employers must file a contractual grievance *before* investigating employee misconduct or imposing discipline.

Similarly, Article 18(H) speaks to the scope of the grievance procedure but does not require prior Labor Relations Committee approval of employee discipline: "This grievance machinery shall be the exclusive remedy with respect to any dispute arising under the Collective-Bargaining Agreement and no other remedies shall be used by the Union, the Employer, or any covered employee until the grievance procedures have been exhausted." W.A. at 35. Article 18(H) says nothing about employee discipline. Yet the Board and the majority would insert new language into the Watchmen's Agreement by reading Article 18(H) to "*expressly limit*[] the Employers' ability to discipline employees 'with respect to any dispute arising under the [Agreement].'" Maj. Op. 11 (emphasis added). There is simply no textual basis for claiming that Article 18(H) makes any provision, express or otherwise, regarding the discipline of employees. *Accord Pac. Mar.*, 367 NLRB No. 121, at *12 (Kaplan dissenting).

The Watchmen's Agreement subjects only those disputes "arising under" its terms exclusively to the Article 18 grievance process. Grievances "aris[e] under" a contract provision when "the resolution of that claim hinges on the interpretation ultimately given the contract clause." *Nolde Bros., Inc. v. Local No. 358*, 430 U.S. 243, 249 (1977). Despite containing detailed rules on many aspects of the employment relationship, the Agreement is generally silent on matters of discipline. The Employers' decision to discipline in this case does not "arise under" the Agreement because no term speaks to Pleas's conduct or the resulting consequences. Grievance procedures like those in Article 18 cannot be read expansively to cover matters outside the contract without undermining the freedom of contract policies embedded in federal labor law. *Cf. Dep't of*

*Navy v. FLRA*, 962 F.2d 48, 57 (D.C. Cir. 1992) ("Because of the fundamental policy of freedom of contract, the parties are generally free to agree to whatever specific rules they like, and in most circumstances it is beyond the competence of the … National Labor Relations Board or the courts to interfere with the parties' choice."). Without any indication that the parties intended to do so, we have no basis for assuming a contractual grievance process covers individual cases of employee discipline.[3]

In reaching a contrary reading of Articles 18(D) and (H), the Board stated only that "article 18's plain language establishes that the parties intended to prohibit all other mechanisms—including, a fortiori, one set forth in a different contract covering a different bargaining unit—for addressing alleged watchman misconduct." *Pac. Mar.*, 367 NLRB No. 121, at \*5. The majority now adopts this finding by relying on an argument the Board did not: that this dispute "arose under" Article 16 of the Watchmen's Agreement, which "broadly prohibits discrimination against 'any person' on the basis of 'race, color, national origin, [and] religious or political beliefs.'" Maj. Op. 11, 18–19. The Board, however, relied exclusively on its reading of Article 18 to find an unlawful contract modification. *See Pac. Mar.*, 367 NLRB No. 121, at

---

[3] The grievance provision of the Clerks' Agreement, by contrast, explicitly specifies that a joint labor relations committee shall "investigate and adjudicate any complaint against any clerk whose conduct on the job … causes disruption of normal harmony in the relationship of the parties hereto or the frustration and/or violation of the provisions of the working or dispatching rules or of this Agreement." Clerks' Agreement § 17.125, at 59. The contrast between this language and Article 18(H) demonstrates the Employers and the Union had alternative language readily available but instead left discipline outside the scope of matters subject exclusively to the grievance process in the Watchmen's Agreement.

*5–6.[4] We cannot sustain an agency's decision on a different basis than the one relied upon below. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947); *Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006) ("Nor can our Court fill in critical gaps in the Board's reasoning. We can only look to the Board's stated rationale.").

Because the Board cannot identify a specific term in the Watchmen's Agreement that subjects employee discipline to the grievance procedure, the Employers did not modify specific terms and conditions contained in the Agreement. The Board failed to establish an unlawful contract modification.

## B.

Even if Article 18 addressed the question of employee discipline, the Board cannot sustain a contract modification charge if the Employers had a "sound arguable basis" for interpreting the Watchmen's Agreement to permit their disciplinary actions. Reading the Watchmen's Agreement as a whole, the Employers clearly had a "sound arguable basis" for their conduct because the Agreement was at least ambiguous with respect to employee discipline outside the contractual grievance procedures of Article 18.

As discussed above, nothing in the plain terms of Article 18 requires discipline to proceed through an employer grievance. Moreover, despite relying heavily on Article 18(D), the Board and the majority ignore clear references to employee

---

[4] The Board referred to Article 16 to reject an argument by one of the Employers that the provision, if applicable, would allow the Employers to investigate and discipline based on such complaints. *See Pac. Mar.*, 367 NLRB No. 121, at *6 n.20. But the Board never found the Employers filed a complaint under Article 16 or that the dispute turned on interpreting this provision.

discipline arising outside the grievance machinery. For instance, Article 18(D)(1) presupposes that a discharge and a grievance are distinct employer actions: "Whatever evidence the parties have or have relied upon relating to the *discharge and/or grievance* shall be provided to the Union at the time of request." W.A. at 33–34 (emphasis added); *see Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018) ("'[O]r' is 'almost always disjunctive.'") (citation omitted). Moreover, Article 18(D) uses the past tense when referring to employee discipline, suggesting review of discipline under the grievance process could occur post hoc. *See* W.A. at 33–34. These provisions at a minimum support a sound arguable basis for concluding that employee discipline may occur before or apart from filing an employer grievance under the Watchmen's Agreement.

Next, the Board and the majority fail to consider the broader structure of the Labor Relations Committee as reflected in Articles 18(A) and (J). Article 18(A) establishes the Committee "to resolve grievances, secure conformance to the terms of the Agreement, maintain current employee registration rosters, maintain dispatch procedures, and generally administer the Agreement." W.A. at 33. None of these roles for the Committee include employee discipline, and the term "grievance[]" is not naturally read to include allegations of employee misconduct. *Supra* at 8–10. Article 18(J) includes an extensive list of topics the Committee must discuss on at least a monthly basis. W.A. at 35.[5] Yet despite

---

[5] Article 18(J) reads:

> There shall be designated monthly [Labor Relations Committee] meetings for the following purposes:
>
> (1.) Two (2) regularly scheduled meetings each month exclusively for general LRC issues

containing significant detail, the list does not include matters of employee discipline. If the Committee were intended as the sole adjudicator of misconduct allegations for hundreds of employees at a large shipping terminal, one would expect this responsibility to be explicit.

Finally, the Employers offer a persuasive interpretation of Article 18(C), which includes the Agreement's only reference to disciplinary rules.[6] This provision instructs the Labor Relations Committee to "establish rules and regulations governing the conduct of watchmen as well as penalties for the breach of these rules and regulations," and provides further that "nothing herein shall restrict the Employer's existing right to discipline or discharge" for five enumerated offenses not implicated in this case. W.A. at 33. According to the

---

(2.) One (1) meeting exclusively for Registered Watchmens' complaints (non-dispatch issues)
(3.) One (1) meeting exclusively for Dispatch Violations
(4.) One (1) meeting exclusively for Emergency watchmen complaints
(5.) One (1) Dispatch Committee meeting exclusively for Time Books and Emergency Watchmen Dispatch Audit
(6.) One (1) meeting exclusively to audit Registered guards Dispatch Records and Reports
(7.) One (1) meeting exclusively for Watchmen Safety.

[6] Article 18(C) reads:

The Labor Relations Committee shall establish rules and regulations governing the conduct of watchmen as well as penalties for the breach of these rules and regulations. However, nothing herein shall restrict the Employer's existing right to discipline or discharge men for intoxication, pilferage, assault, incompetency, or failure to perform work as directed, but any man who considers that he has been improperly disciplined or discharged may appeal to the Labor Relations Committee.

Employers, Article 18(C)'s reference to an "existing right" means they retain the right to discipline for an offense unless the Committee issues rules and penalties applicable to that offense. The five enumerated offenses represent carve-outs for which the Committee cannot preempt the Employers' discretion. Read together, "a reasonable interpretation is that [Article 18(C)] is limited to granting the [Committee] the power to make disciplinary rules, so long as those rules do not restrict the employers' right to discipline for the five enumerated offenses, but does not limit the Employer's ability to discipline employees in the absence of any controlling [Committee] rule." *Pac. Mar.*, 367 NLRB No. 121, at *12 (Kaplan dissenting). The majority says this interpretation renders the enumeration superfluous, Maj. Op. 12, but the Employers' interpretation of Article 18(C) preserves a role for the grievance process to resolve complaints by the Union and the Employers, to channel disputes into binding arbitration, and to allow grievances to be filed after discipline if its imposition conflicts with the Agreement.

The majority's "sound arguable basis" analysis does not square with precedent. Rather than engage de novo with the plain meaning of the contract, the majority seeks to squeeze its interpretation into substantial evidence deference whenever possible. *See* Maj. Op. 13–16. Yet disputed evidence of past practice and bargaining history cannot supplant plain meaning, which, as discussed further below, is the lodestar of the sound arguable basis analysis. At most, the majority demonstrates that Article 18 may be interpreted to cover individual cases of employee discipline. But one plausible interpretation does not foreclose the Employers' interpretation as fundamentally unsound.

To defeat this contract modification charge, the Employers needed only a "sound arguable basis" to argue the Watchmen's

Agreement allowed disciplining Pleas for racial harassment without filing an Article 18 grievance. Because the Agreement is at a minimum ambiguous on employee discipline outside the contractual grievance procedure, the Employers had a "sound arguable basis" for their disciplinary actions.

## C.

The Board further erred by supporting its contract modification finding with extrinsic evidence that the Union rejected terms like those in Section 13.2 of the Clerks' Agreement and that the parties had not previously applied such procedures to discrimination allegations. The Board concluded that "the parties' past practice and bargaining history" meant that the Employers "could not have mistaken or misunderstood [the Union's] intent that no such [Section 13.2] procedure be applicable to watchmen." *Pac. Mar.*, 367 NLRB No. 121, at *5–6, *16. Under the "sound arguable basis" test, however, the Board's authority to interpret contracts ends where ambiguity begins. Rather than dismiss the charge in the face of ambiguity, the Board reached beyond the four corners of the Watchmen's Agreement by looking to the evidence it used to find a unilateral change violation. Yet as noted earlier, the contract modification analysis does not turn on whether the Employers applied Section 13.2 to Pleas, or whether the Union would have consented to amending Article 18 to include such procedures. Rather, the issue is whether the Employers had a "sound arguable basis" for disciplining Pleas without filing a grievance under the Watchmen's Agreement. Relying on extrinsic evidence caused the Board's decision to run crosswise with longstanding precedent.

To begin with, the Board's use of extrinsic evidence to rebut the Employers' otherwise "sound arguable basis" rests on a misreading of prior cases. For example, the Board cites

*Knollwood Country Club*, 365 NLRB No. 22 (Mar. 8, 2017), for the proposition that plain meaning and extrinsic evidence stand on equal footing when interpreting a contract. In *Knollwood*, however, the Board rejected an employer's interpretation as unreasonable because the employer failed to read the contract as a whole and merely noted that extrinsic evidence "also" was consistent with the plain meaning of the contract. *Id.* at \*1 & n.8. This holding is consistent with ordinary principles of contract interpretation embracing the plain meaning approach. Moreover, *Knollwood* relied in relevant part on *Mining Specialists, Inc.*, 314 NLRB 268, 268–69 (1994), a unilateral change case emphasizing that "contractual language … is always paramount." Neither the Board nor the majority cite to a single case in which extrinsic evidence supported a finding of contract modification when the provision in question was ambiguous. In fact, both the agency's precedents and the law of this circuit are clear that plain meaning governs when adjudicating unfair labor practices arising from contract.[7] The Board's limited statutory authority

---

[7] *See, e.g.*, *Metalcraft of Mayville, Inc.*, 367 NLRB No. 116, at \*4–5 (Apr. 17, 2019) (dismissing charge where employer had a "colorable" argument that "conforming to applicable law" provision allowed it to stop deducting union dues pursuant to state law); *MV Transp.*, 368 NLRB No. 66, at \*28–34 (dismissing several charges where employer had a "sound arguable basis" for interpreting contract to allow new company policies); *see also Am. Fed'n of Gov't Emps. v. FLRA*, 470 F.3d 375, 381 (D.C. Cir. 2006) ("Interpretation of a contract, like statutory and treaty interpretation, must begin with the plain meaning of the language."). Evidence of prior practice and bargaining history, if mentioned at all, are cited only to note its consistency with plain meaning. *See, e.g.*, *ADT*, 369 NLRB No. 31, at \*5 & n.10 (concluding plain language required dismissing modification charge and then noting the parties' past practice "further supports" the interpretation offered by the employer); *Comau*, 364 NLRB No. 48, at \*5 & n.16 (in the absence of an applicable contract provision, prior practice demonstrated the

over contract disputes necessarily means it cannot use extrinsic evidence to refute plain meaning or resolve ambiguity, which is a role reserved for the courts.

Perhaps the fundamental problem of the Board's approach here is that it sought to revise the contract modification standard *sub silentio*. By deploying extrinsic evidence in a "sound arguable basis" inquiry, the Board failed to adhere to governing law setting out distinct evidentiary standards for contract modification and unilateral change. For example, in *Bath Iron Works*, the Board distinguished between contract modification and unilateral change and rejected arguments to apply the same standard to both charges. *See* 345 NLRB at 501–02. Instead, the Board reaffirmed that the "sound arguable basis" test governs contract modification charges—a policy the Board continues to follow. *See MV Transp.*, 368 NLRB No. 66, at *13–17, *28 (emphasizing the Board's limited authority to interpret contracts and declining to go beyond plain meaning when adjudicating unfair labor practices). Here, rather than assess the Employers' "sound arguable basis" against the plain meaning of the Agreement, the Board held the Employers to a different standard by faulting them for not proving the Union would have accepted procedures like those in Section 13.2 of the Clerks' Agreement.[8]

---

contract applied to employees in question); *Hosp. San Carlos, Inc.*, 355 NLRB 153, 153 & n.5 (2010) (concluding plain meaning foreclosed employer's interpretation before observing that testimony regarding the parties' intent also supported the conclusion).

[8] To determine whether an employer unilaterally changed an established prior practice, the Board often looks to evidence of conduct and bargaining history—typically a mix of testimony and non-contractual written records. *See, e.g.*, *ABF Freight*, 369 NLRB No. 107, at *2–3 (discussing evidence of employer's past actions). Similarly, extrinsic evidence is relevant when an employer raises

This intermingling of legal frameworks for contract modification and unilateral change, however, has never been adopted by the Board as a whole and has been previously advanced only in dissenting opinions.[9] Yet in this case, two members of a three-member panel conflated the evidentiary standard for contract modification with those for unilateral change and waiver. Unlike many multi-member agencies, the NLRB decides cases by delegating to three-member panels as a matter of course. *See* 29 U.S.C. § 153(b); NLRB, Guide to Board Procedures § 3.8(a) (Apr. 2017). As a consequence of this practice, a position held by a two-member minority of the five-member Board may prevail on a panel in a manner inconsistent with the Board's governing precedents.[10]

---

a waiver defense, which requires showing the union clearly and unmistakably waived its statutory right to bargain on the contested issue. *See, e.g.*, *Provena Hosps.*, 350 NLRB 808, 811 (2007).

[9] Over the years, a persistent minority of the Board has questioned whether *Bath Iron Works* was wrongly decided and advocated for limiting the "sound arguable basis" standard or imposing a different standard that falls within the scope of the Board's substantial evidence deference for factfinding. *See, e.g.*, *Metalcraft*, 367 NLRB No. 116, at *15 (McFerran dissenting); *MV Transp.*, 368 NLRB No. 66, at *41 (McFerran concurring in part and dissenting in part); *Knollwood*, 365 NLRB No. 22, at *1 n.5 (separate footnote by Pearce and McFerran); *Comau*, 364 NLRB No. 48, at *4 n.14 (separate footnote by Pearce and Hirozawa); *Bath Iron Works*, 345 NLRB at 504 (Liebman dissenting); *see also Pac. Mar.*, 367 NLRB No. 121, at *5 n.15 (separate footnote by McFerran) (reserving the question of whether *Bath Iron Works* was wrongly decided).

[10] The question is not whether the procedure is permissible under the NLRA, or whether the Employers challenged its use in this case. *Cf.* Maj. Op. 18–19. Rather, the question is whether this panel of the Board followed the agency's announced standards. Given the unexplained break with precedent evident in this case, I would answer that question in the negative.

Although the NLRA authorizes decisions by delegated panels, those panels must follow the Board's announced standards in order to satisfy the reasoned decisionmaking requirement applicable to all administrative action. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). As a reviewing court, we must ensure the Board adheres to its announced standards, not the preferred interpretations of individual members. *See Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169–70 (D.C. Cir. 2016) (applying the "almost universally accepted common-law rule" that "only a majority of a collective body is empowered to act for the body") (cleaned up).

The majority endorses the Board's use of extrinsic evidence by taking a myopic view of governing law. When reviewing an adjudicatory standard, we must examine its application in prior cases and then determine whether the instant case is a faithful application of existing law. *See Circus Circus*, 961 F.3d at 476. Instead, the majority relies on a selective reading of the Board's decision in *Knollwood*, *see* Maj. Op. 14, and fails to engage with cases like *Bath Iron Works* and *MV Transportation* that set out a clear plain meaning requirement. It is a fundamental principle of administrative law that prior departures from announced standards do not excuse an agency's duty to acknowledge and justify a change in policy. "It is hard to imagine a more violent breach of that requirement than applying a rule of primary conduct or a standard of proof which is in fact different from the rule or standard formally announced. And the consistent repetition of that breach can hardly mend it." *Allentown Mack*, 522 U.S. at 374; *see, e.g.*, *ABM Onsite Servs.-West, Inc. v. NLRB*, 849 F.3d 1137, 1144–46 (D.C. Cir. 2017) (vacating order when the Board improperly applied the applicable standard over the course of four years). Without a reasoned revision by the Board of the "sound arguable basis" standard,

this court must reject individual decisions departing from those standards. The Board in this case was wrong to dislodge the employer's reasonable interpretation using extrinsic evidence.

\* \* \*

Contract modifications are breaches of contract that rise to the level of offending public rights by undermining the collective bargaining process. The "sound arguable basis" standard provides a means of separating unfair labor practices from contractual disputes reserved for the courts. *See Honeywell*, 253 F.3d at 123–25; *Int'l Union, United Mine Workers of Am. v. NLRB*, 257 F.2d 211, 215 (D.C. Cir. 1958). By finding a contract modification in these circumstances, the Board departed from precedent in an arbitrary and capricious manner and exceeded its limited jurisdiction over contract disputes. I therefore respectfully dissent from enforcing the Board's contract modification finding.